**NATIONAL REJECTORS INDUSTRIES,**
**etc., Appellee,**

**v.**

**UNITED STEELWORKERS OF AMERI-**
**CA, etc., et al., Appellants.**

**No. 77–1318.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 17, 1977.

Decided Aug. 30, 1977.

---

**12.** Testimony at trial indicated that the predicted completion date at that time was *October 1976.*

the parties to submit their disputes to arbitration proceedings. Pending appeal, the district court stayed the latter portion of its order. Similarly, an administrative panel of this court stayed the remainder of the order pending resolution on the merits. For the reasons hereafter stated, we dissolve these stays and affirm the judgment of the district court.[1]

James E. Youngdahl (argued and on rebuttal) and Kenneth L. Schorr, Little Rock, Ark., on brief for appellants.

Edward Katze, Atlanta, Ga. (argued), Lovic A. Brooks, Jr., Charles A. Edwards, Atlanta, Ga., and Don M. Schnipper of Wood, Smith & Schnipper, Hot Springs, Ark., on brief for appellee.

Before GIBSON, Chief Judge, and LAY and ROSS, Circuit Judges.

ROSS, Circuit Judge.

Plaintiff-appellee National Rejectors Industries (NRI or the company) commenced this action in district court seeking money damages and injunctive relief to redress violations and to compel specific performance of a collective-bargaining agreement. Defendant-appellants are the United Steelworkers of America, AFL–CIO (the union), its Local No. 6178 (the local), and several union officials. Disputes had arisen between the parties culminating in the suspension of large numbers of union employees for violations of company work rules, resulting in a sharp decline in productivity at the company's plant. The district court assumed jurisdiction pursuant to section 301 of the Labor Management Relations Act, 1947 (LMRA), 29 U.S.C. § 185, and granted an injunction enjoining, *inter alia,* further violations of the work rules, and ordering

I.

NRI is a subsidiary of a Delaware corporation and maintains an office and plant in Hot Springs, Arkansas where it manufactures coin and currency changing devices. The company employs over 400 persons at its Hot Springs plant, some 300 of which are production and maintenance workers. The union and its local have been the exclusive collective bargaining representatives for the company's production and maintenance workers since 1961. The parties have stipulated that the company is an industry affecting commerce within the meaning of sections 2(7) and 301 of the LMRA, 29 U.S.C. §§ 152(7) and 185. It is likewise agreed that the union is a labor organization within the meaning of section 2(5) of the Act, 29 U.S.C. § 152(5), and that it is engaged in representing employee members in the Western District of Arkansas. *See* LMRA § 301(c)(2), 29 U.S.C. § 185(c)(2).

The company and the union are parties to a collective-bargaining agreement.[2] Article XXXIV of the agreement provides that "there shall be no strikes, slow-ups, stoppages of work * * * or other interference with the operations of the Company during the term of this Agreement." Article XV provides that all disputes concerning the meaning or application of the agreement be resolved by a four-step grievance and arbitration procedure.[3] "Step 1" calls

---

1. An order dissolving the stays and reinstating the injunction issued by the district court was entered by this court on June 17, 1977, after hearing oral argument of the parties, Judge Lay dissenting.

2. The agreement is dated January 8, 1975, and by its terms will remain in full force and effect until January 15, 1978.

3. Article XV states in part:

   GRIEVANCE PROCEDURE

   Section 1. Should any difference arise between the Company and the Union or its members employed by the Company as to the meaning, application or violation of the

for any grievance to be first submitted by the affected employee to his foreman, the latter to respond in writing to the grievance. "Step 2" provides that appeals by either party be submitted to a meeting between management representatives and the grievance committee of the local union. "Step 3" requires further appeals to be resolved at a meeting between the national organization of the union and representatives of company executives. If the dispute is still not resolved, "Step 4" provides for submission of the matter to final and binding arbitration, and specifies a method of selecting an arbiter.

At a meeting in December 1976 an incident occurred which resulted in the company's discharging Frankie Joe Russell, president of the local union, and suspending for 30 days two other officers of the local.[4] The union filed grievances with respect to these actions. Russell and the two suspended officers were designated members of the local's grievance committee for purposes of "Step 2" of the grievance procedure outlined above. When Step 2 negotiations were reached, the company requested that further proceedings be conducted at the next higher level, over the local's grievance committee, in accordance with its interpretation of Article XV of the collective-bargaining agreement.[5] The union refused, insisting that Russell and the two suspended officers be involved in the grievance proceedings. The company in turn refused to meet with Mr. Russell, but remained willing to proceed at the next higher level. The union then filed grievances over the company's refusal to abide by the grievance procedures. At this point, negotiations between the parties reached an impasse.

On January 13, 1977, the union filed charges against the company with the National Labor Relations Board (NLRB), alleging that the dismissal and suspensions of the local officers constituted unfair labor practices under section 8 of the National Labor Relations Act, 29 U.S.C. § 158, in violation of rights guaranteed in section 7 of the Act, 29 U.S.C. § 157. On February 22nd, the NLRB filed a complaint against the company incorporating these allegations.

In early March 1977 the company promulgated six new work rules for employees at the Hot Springs plant.[6] The union was

---

terms and provisions of this Agreement, there shall be no suspension or impeding of work on the part of the Union or lockout on the part of the Company on account of such differences—but an earnest effort shall be made to settle such differences immediately in the following manner:

Following are four steps, discussed in text *infra*.

4. The two suspended officers were Clois Lishbrook, vice-president, and Margaret Sue Loudermill, recording secretary.

5. Section 4 of Article XV states in pertinent part:

Should the actions of the representatives of either party be such that the integrity of the grievance procedure is threatened, then the authorized 3rd step representative of the Company or Union shall notify the opposite party who shall investigate and report back the results of such investigation and the corrective action taken, if any. If such report is not satisfactory or if the facts are in dispute either party may request a meeting for the purpose of determining the facts and settling the issue. If the issue is not satisfactorily settled at this meeting either party may request the other to take such action as may be appropriate and necessary to correct the problem. *In this event, the grievance machinery shall continue to function with the next highest officials of the Company and Union conducting the meetings* to insure the processing of grievances in a timely manner until such time as both parties are agreed that normal operation of the grievance procedure can be resumed. (Emphasis supplied.)

The company felt Mr. Russell's participation in the negotiations concerning his own dismissal threatened the integrity of the grievance procedure and requested a union investigation of his conduct. The union reported back that there was nothing irregular in Mr. Russell's conduct. This report being unsatisfactory, the company requested a meeting and one was had. Being still unable to settle the issue, the company suggested that Mr. Russell's removal from the grievance committee was necessary to correct the problem. The company contends that the grievance machinery should then have continued to operate with the next highest union representatives, in accordance with the emphasized language of section 4.

6. The new work rules read as follows:

1. There will be no magazine reading, newspaper reading, book reading, crossword puz-

given notice of these rules, but again refused to negotiate with the company without Mr. Russell being present as a representative. The company then placed the rules into effect on March 14. Clois Lishbrook, acting president of the local in the absence of Mr. Russell, told company representatives that she did not intend to comply with the new rules and stated that she did not think any of the other union employees should comply with them either.

Under procedures established by the company for enforcing its work rules, an employee was given a verbal warning following his first violation; a second violation resulted in a written warning. Following a third violation, the employee was informed that further violations would result in his being temporarily suspended.

Within four days after the new rules went into effect, 138 employees had been suspended for violating them. The union immediately filed grievances with respect to each of these suspensions. By this time, production at the plant had dropped to 30% of normal. In an effort to maintain an active work force, the company decided on March 18 to suspend further enforcement of the rules.[7] Later that day, the company notified the union that it was willing to waive the intermediate steps of the grievance procedure and begin immediate arbitration on all the grievances theretofore filed by the union. The company also offered to continue suspending enforcement of the work rules pending resolution of these grievances through arbitration. When the union refused, the company sought relief in the district court.

The district court found that, by violating the work rules, union employees had engaged in concerted activity calculated to slow up and impede production at the plant, that this activity was precipitated by disputes then existing between the union and the company, that these disputes were arbitrable and, therefore, that these actions violated Articles XV and XXXIV of the collective-bargaining agreement. Accordingly, the court entered its order enjoining further union efforts to impede production at the plant and requiring the parties to submit their disputes to arbitration. The union responded by filing this appeal.

### II.

We are confronted at the outset with the union's contention that the instant case falls within the exclusive jurisdiction of the NLRB, thus depriving the district court of its power to issue an injunction. This argument is based on the preemption doctrine, announced in *San Diego Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), which teaches that "[w]hen an activity is arguably subject to § 7 or § 8 of the [National Labor Relations] Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Id.* at 245, 79 S.Ct. at 780.

■ The union asserts that the company's dismissal of Frankie Joe Russell, its

---

zles worked on, games played or any other non-NRI reading during working hours, except during authorized breaks or lunch periods.

2. There will be no soliciting for any purpose during work hours, except during authorized breaks or lunch periods.

3. All employees are required to log into and out of their departments per published instructions.

4. All union officers must log in and out on official grievance handling time per published instructions.

5. There will be no consumption of food or beverages in any work area, except during authorized breaks or lunch periods.

6. Falsification of production counts, records or activity logs is prohibited. Each employee is required to accurately record production counts, other records and the activity log.

Donald Brannan, director of personnel and industrial relations for NRI, testified that the company had experienced problems with employees leaving their work areas without authorization since November of 1976.

7. Violations of rules 3 and 4, relating to logging in and out procedures (*see* note 5 *supra*), were involved in each of the 138 employee suspensions. It was enforcement of these two rules which the company suspended.

subsequent refusal to meet with him, and its promulgation of the new work rules are unfair labor practices under § 8 of the National Labor Relations Act, 29 U.S.C. § 158. This may well be true, though the question is not before us.[8] It does not follow, however, that such a conclusion would serve to divest the district court of jurisdiction in this case, which was brought to enforce the terms of a collective-bargaining agreement under § 301(a) of the LMRA, 29 U.S.C. § 185(a).[9] It has long been recognized that, by its enactment of § 301, "Congress deliberately chose to leave the enforcement of collective agreements 'to the usual processes of the law.'" *Charles Dowd Box Co., Inc. v. Courtney,* 368 U.S. 502, 513, 82 S.Ct. 519, 526, 7 L.Ed.2d 483 (1962). Thus, in cases brought under § 301, the district court's jurisdiction is not curtailed even if the disputed activity also constitutes an unfair labor practice. *Farmer v. United Brotherhood of Carpenters and Joiners of America, Local 25,* 430 U.S. 290, 297 n. 8, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977); *William E. Arnold Co. v. Carpenters District Council of Jacksonville,* 417 U.S. 12, 16, 94 S.Ct. 2069, 40 L.Ed.2d 620 (1974).

■ Accordingly, we reject the union's claim that the NLRB has exclusive jurisdiction over the subject matter of this case.

### III.

The union next contends that the district court was precluded from issuing an injunction by the anti-injunction provisions of the Norris-LaGuardia Act.[10] In making this argument the union candidly acknowledges that in *Boys Markets v. Retail Clerks Un-*

*ion,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court recognized an exception to Norris-LaGuardia's anti-injunction provisions in certain cases brought under § 301.[11] It nevertheless insists that this exception does not apply to the facts of the instant case. We therefore begin our consideration of the union's claim by examining the scope of the *Boys Markets* exception.

In *Boys Markets* the employer and the union were parties to a collective-bargaining agreement containing, *inter alia,* a "no-strike" obligation and provisions for resolution of all disputes arising under the contract through mandatory adjustment and arbitration procedures. A dispute arose between the parties when the union demanded that supervisory employees cease performing tasks claimed to be union work. The union struck when this demand was rejected. The employer sought injunctive relief under § 301 to halt the strike, admitted to be a violation of the no-strike clause of the contract. The union defended in part on the basis of Norris-LaGuardia's anti-injunction provisions. The Supreme Court was thus called upon to balance the conflicting policies embodied in Norris-LaGuardia's apparent flat ban against injunctions on the one hand, and the authority conferred by § 301 to resolve contract disputes on the other. After reviewing the history of both statutes, the Court struck this balance by declaring that "Norris-LaGuardia's policy of nonintervention by the federal courts should yield to the overriding interest in the successful implementation of the arbitration process." 398 U.S. at 252,

---

**8.** We do not in this case consider the merits of the company's actions; we consider only whether the union's *reactions* created a dispute which the parties had obligated themselves to resolve through arbitration under the collective-bargaining agreement.

**9.** Section 301(a) provides:
Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties,

without respect to the amount in controversy or without regard to the citizenship of the parties.

**10.** Section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, provides in part:
No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute * * *.

**11.** 29 U.S.C. § 185, quoted in part in note 8, *supra.*

90 S.Ct. at 1593. The rationale of this decision is apparent:

> Indeed, the very purpose of arbitration procedures is to provide a mechanism for the expeditious settlement of industrial disputes without resort to strikes, lockouts, or other self-help measures. This basic purpose is obviously largely undercut if there is no immediate, effective remedy for those very tactics that arbitration is designed to obviate.
>
> \* \* \* \* \* \* .
>
> We conclude, therefore, that the unavailability of equitable relief in the arbitration context presents a serious impediment to the congressional policy favoring the voluntary establishment of a mechanism for the peaceful resolution of labor disputes, that the core purpose of the Norris-LaGuardia Act is not sacrificed by the limited use of equitable remedies to further this important policy, and consequently that the Norris-LaGuardia Act does not bar the granting of injunctive relief in the circumstances of the instant case.

398 U.S. at 249, 253, 90 S.Ct. at 1591, 1593. In reaching its conclusion, the Court cautioned that its holding was a "narrow one. \* \* \* We deal only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure." *Id.* at 253, 90 S.Ct. at 1594. Cases decided subsequent to *Boys Markets* have made it clear that an injunction is appropriate only when such relief is necessary to compel specific performance of the mandatory arbitration provisions of the contract. *See Buffalo Forge Co. v. Steelworkers,* 428 U.S. 397, 409, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). Thus, it is not the strike itself, or the violation of a no-strike clause that it represents, that will be enjoined. It is essential in each case that the activity being enjoined represents a union response to a dispute over a grievance which the union was contractually bound to arbitrate. *Id.* Finally, adopting the principles expressed in the dissenting opinion in *Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), the Court has required that:

Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance.

*Boys Markets, supra,* 398 U.S. at 254, 90 S.Ct. at 1594, *quoting from Sinclair, supra,* 370 U.S. at 228, 82 S.Ct. 1328.

Summarizing, we conclude that *Boys Markets* and later cases authorize the issuance of an injunction when (1) the union is engaged in a strike or other violation of a "no strike" clause of a collective-bargaining agreement, if (2) the violation was precipitated by a dispute between the parties, which dispute is (3) subject to mandatory grievance or arbitration procedures provided for in the agreement, and (4) issuance of the injunction is otherwise warranted under ordinary principles of equity.

Applying these principles to the facts of the instant case, we conclude that the district court properly issued an injunction against further disruptions of the company's operations in conjunction with its order to arbitrate.

**(A)** *Union employees, by refusing to comply with the work rules, violated the terms of the "no strike" clause.*

Article XXXIV of the collective-bargaining agreement provides that, during the term of the contract, there "shall be no strikes, slow-ups, stoppages of work, sitdown strikes, refusals to handle merchandise, material or equipment *or other interference with the operations of the Company.*" (Emphasis supplied.) The district court found that union employees at the Hot Springs plant violated the company's work rules in order to incur suspensions for the purpose of disrupting operations at the plant. The union does not challenge the accuracy of this finding and we conclude

that substantial evidence in the record supports it. The testimony establishes that under company procedures suspension of an employee resulted only after the employee had violated the work rule at least four times. Prior violations were dealt with by giving the employee a verbal warning, a written warning, and notice that further violations would result in suspension. The work rules here in question involved a relatively simple procedure of writing one's name in a company log book before leaving his assigned work station during business hours. Nevertheless, some 138 employees managed to violate the rules a sufficient number of times to incur suspension within only three working days after the rules were placed in effect. In addition, the acting president of the local union expressed to representatives of the company her intention to disregard the rules and her belief that other employees should do the same. This testimony is wholly unrebutted by the union.

■ Accordingly, we agree with the district court that the employees violated the work rules in order to incur suspensions for the purpose of disrupting operations at the plant, and that this activity violated the provisions of Article XXXIV of the collective-bargaining agreement.[12]

(B) *and* (C) *The violation of the "no strike" clause was precipitated by a dispute between the parties over a grievance subject to arbitration under the collective-bargaining agreement.*

There can be no question on the record before us that the violations of the work rules and consequent suspensions resulted from a dispute between the parties. The district court concluded only that this dispute was over grievances "then existing" between the parties "having to do with interpretation of the Collective Bargaining [Agreement] and operations and procedures thereunder." Whether these grievances related to the dismissal of Frankie Joe Russell and the suspensions of the other two officers, or whether they related to dissatisfaction with the work rules themselves, or both, there is no contention made that such grievances would not be subject to the grievance and arbitration procedures specified in the contract. Indeed, the union has filed numerous grievances with respect to each in an attempt to invoke those procedures.

■ The essence of the union's argument is that the company's unwillingness to meet with Mr. Russell as a member of the local's grievance committee made arbitration an impossible goal since "Step 2" of the grievance procedure leading to arbitration could never be completed. We reject this argument for two reasons. First, we are convinced that the issue of whether completion of "Step 2" is a condition precedent to arbitration itself presents an arbitrable dispute under the terms of Article XV of the agreement. Section 4 of that Article specifies circumstances in which "Step 2" meetings are not required when the conduct of either party "threatens the integrity" of the grievance procedure.[13] Section 1 of that Article broadly makes all questions concerning the "meaning" or "application" of the provisions of the contract subject to the specified grievance and arbitration procedures. We conclude that this language encompasses the dispute concerning the necessity of completing "Step 2" before proceeding to arbitration.[14] Second, we are

---

12. The union's contention that no injunction can issue because there was no "strike" as such is without merit. *See Avco Corp. v. Local No. 787, UAW,* 459 F.2d 968, 974 (3d Cir. 1972) (enjoining employee refusal to work overtime.)

13. *See* note 4, *supra.*

14. We are bolstered in our conclusion by the Supreme Court's consistent recognition of the presumption favoring a finding of arbitrability as a means of implementing the "well-estab-

lished federal labor policy favoring arbitration as a means of resolving disputes over the meaning and effect of collective-bargaining agreements." *Nolde Brothers, Inc. v. Local No. 358, Baker & Confectionary Workers,* 430 U.S. 243, 254, 97 S.Ct. 1067, 1073, 51 L.Ed.2d 300 (1977).

unpersuaded that questions concerning the procedural aspects of resolving a dispute of this kind present a bar to arbitration.

Once it is determined, as we have, that the parties are obligated to submit the *subject matter* of a dispute to arbitration, "procedural" questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator.

\* \* \* \* \* \*

[W]e think it best accords with the usual purposes of an arbitration clause and with the policy behind federal labor law to regard procedural disagreements not as separate disputes but as aspects of the dispute which called the grievance procedures into play.

*John Wiley & Sons v. Livingston,* 376 U.S. 543, 557, 559, 84 S.Ct. 909, 918, 919, 11 L.Ed.2d 898 (1964) (emphasis supplied).

(D) *An injunction was warranted in the circumstances of this case under general principles of equity.*

■ The district court found, and it is undisputed, that following the suspensions of employees for violating the work rules, production at the company's plant dropped to 30% of normal. The record also establishes that continued interferences with production will result in lower output, delays in deliveries, and may result in failures by the company to perform existing contracts and in securing future contracts. In light of our conclusion that the suspensions were stimulated by the employees' desire to disrupt operations at the plant, we likewise conclude that the company's willingness to suspend enforcement of the work rules does not preclude the district court's finding that irreparable injury will result to the company if an injunction against future disruptions is not granted. It is likewise undisputed that the company was at all times prepared to proceed to a resolution of its disputes with the union through arbitration. Finally, the union offered no evidence of how it would be injured if an injunction was granted, with the exception of its claim that the local would be deprived of the services of Frankie Joe Russell as its representative. In these circumstances, we conclude that an injunction against further union disruptions of company operations, and ordering the parties to proceed to arbitration, was justified.

*Anheuser-Busch, Inc. v. Teamsters Local No. 633,* 511 F.2d 1097 (1st Cir.), *cert. denied,* 423 U.S. 875, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975), the case primarily relied upon by the union, is not to the contrary. In that case the employer instituted a work rule prohibiting employees from wearing "tank-tops" to work. When the employees persisted in wearing such attire, the employer suspended them, thereby effectively shutting down the plant. The court reversed an order of the district court granting an injunction, saying "an employer cannot be permitted to qualify for injunctive relief simply by responding to minor employee infractions in a way that brings serious and irreparable damage upon himself by causing a shutdown." *Id.* at 1099. In considering the potential harm to the employer *in the absence of an injunction,* the court concluded that "[h]aving some employees wear tank-tops, even during the summer when there are likely to be more than the usual number of persons touring the plant, cannot be considered the type of injury properly providing a basis for injunctive relief." *Id.* at 1100.

We see no analogy between the facts presented in *Anheuser-Busch* and those in the instant case. Here, NRI did not bring about the disruption itself by insisting upon enforcement of minor work rules. The company was willing to, and did in fact suspend enforcement of its rules pending resolution of the underlying dispute through arbitration. In addition, the injury to NRI threatened by continued disruptions of employees at the Hot Springs plant, even in the absence of work rules, is clearly greater than the potential harm of having one's employees present an unsightly appearance to visitors at the plant. We think these factors sufficiently distinguish this case from the situation presented in *Anheuser-Busch.* The court there appears to have foreseen this distinction and carefully limited the rule it was announcing, saying:

Our holding here should not be taken as one that an employer will never be successful in demonstrating that he will be seriously or irreparably harmed if prevented from effectively enforcing a work rule pending arbitration. * * * [I]n another case, there might be an adequate showing that *employee disregard of work rules was seriously undermining an employer's ability to conduct his business.* Here, however, there has been on the employer's part nothing more than the undifferentiated claim that there exists a right to make and enforce rules pending the outcome of a grievance and arbitration procedure, and we reject the contention that the labor injunction is available in the ordinary course of events as an enforcement mechanism. * * * We hold merely that in this case there was not a showing of *potential injury adequate to support relief under general equitable principles.*

*Id.* at 1100 (emphasis supplied).

In conclusion, we are satisfied that the district court applied the appropriate standards for determining whether an injunction should issue, and that his order conforms with the spirit of the narrow exception to the Norris-LaGuardia Act created by *Boys Markets.* Accordingly, the judgment of the district court should be and is affirmed.

LAY, Circuit Judge, dissenting.

The majority opinion misconstrues the limited incursion into the Norris-LaGuardia Act, 29 U.S.C. § 104, authorized by *Boys Markets v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). As explained in *Buffalo Forge Co. v. Steelworkers,* 428 U.S. 397, 402, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), the limited authority which *Boys Markets* granted to a federal court to enjoin a strike in violation of a no-strike clause within a collective bargaining agreement is applicable only when the strike is *over* the arbitrable dispute. In the

present case the record is clear that the dispute which led to the refusal to arbitrate is not related to the alleged violation of the no-strike clause. Rather, the dispute arises from the inability of the company and the union to agree on the proper grievance procedures.

The fundamental grievance involved in the present case relates to the discharge of an employee who is a union representative. The union is willing to submit this issue to the grievance and arbitration procedures set forth under the contract. Tangentially, there now exists a grievance over the implementation of a petty work rule requiring, *inter alia,* employees to sign in and out when going to the bathroom. The union is willing to submit this dispute to grievance and arbitration procedures as well. The company has indicated that it is willing to submit these issues to arbitration but refuses to negotiate grievances with the union if the discharged union representative is present. The union insists that the union representative be present; thus the parties have reached an impasse.[1] It should be plain enough that refusal to arbitrate in this case is not related to the enforcement of the work rule, or to the employees' refusal to follow the work rule, or to the company's suspensions for violation of the same. The impasse reached relates to the procedural steps to be followed in implementation of the grievance and arbitration procedures under the contract. At issue is a matter of contract interpretation, and although a procedural question is presented it is now well-settled that procedural issues as well as substantive questions are exclusively for the arbiter. *See John Wiley & Sons v. Livingston,* 376 U.S. 543, 557, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); *Drivers Local No. 120 v. Sears, Roebuck & Co.,* 535 F.2d 1072, 1075 (8th Cir. 1976). Although the majority agrees with this premise, it finds a violation of the no-strike clause of the contract resulting from the employees' non-

---

1. The company is willing to suspend the work rules if the union is willing to acquiesce in the company's proposed grievance procedure. I think the obvious inference follows that the

implementation of the work rule by the company was in retaliation to the union's refusal to arbitrate without the discharged union representative present.

compliance with work rules and thus encroaches upon the arbiter's exclusive jurisdiction. *Cf. Buffalo Forge Co. v. Steelworkers, supra.* In thus interpreting the contract the majority ignores the decisions of this court and other courts which have uniformly held that the interpretation of the collective bargaining agreement lies within the exclusive domain of the arbiter. *See* e. g. *Drivers Local No. 120 v. Sears, Roebuck & Co. supra,* at 1075.

Relying upon *John Wiley & Sons v. Livingston, supra,* the majority finds that the union's insistence on following the procedural steps set out in the contract cannot be a bar to arbitration over the disputes. As valid as this view may be, it does not follow from *Wiley,* as the majority concludes, that the procedural impasse reached necessarily grows out of the arbitrable dispute authorizing injunctive relief pending arbitration. *Wiley* clearly does not come close to holding this. This view ignores the fact that the union is ready and willing to submit the issue over the discharge (or anything else) to the grievance and arbitration procedure under the contract. What the union refuses to do is to acquiesce in the company's interpretation of the grievance clause as to the procedure to be followed. The *Wiley* decision does provide the solution for the present case. The district court should limit its order to require the parties to submit the procedural issue and at least the related issue of the discharge to arbitration.

Both *Anheuser-Busch, Inc. v. Teamsters Local No. 633,* 511 F.2d 1097 (1st Cir. 1975), *cert. denied,* 423 U.S. 875, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975), and *Buffalo Forge* indicate that the court may order arbitration without issuing a plenary injunction affecting the no-strike clause. In *Anheuser-Busch* the court made clear in its conclusion that the union was willing to arbitrate and no limited order was necessary. In *Buffalo Forge* the Court explicitly acknowledged that the employer was entitled to an order requiring the union to arbitrate if the union refused to do so. However, as the Court observed:

[I]t does not follow that the District Court was empowered not only to order arbitration but to enjoin the strike pending the decision of the arbitrator, despite the express prohibition of § 4(a) of the Norris-LaGuardia Act against injunctions prohibiting any person from "[c]easing or refusing to perform any work or to remain in any relation of employment." 428 U.S. at 410, 96 S.Ct. at 3148.

Here, the district court should stay the issuance of its injunction as it relates to enforcing the work rule pending arbitration and resolution of the procedural issue involved.

The majority decision allows the federal court to intervene in a breach of contract case and violate the narrow jurisdictional basis afforded the court in *Boys Markets.* As Mr. Justice White stated in *Buffalo Forge*:

If an injunction could issue against the strike in this case, so in proper circumstances could a court enjoin any other alleged breach of contract pending the exhaustion of the applicable grievance and arbitration provisions even though the injunction would otherwise violate one of the express prohibitions of § 4. The court in such cases would be permitted, if the dispute was arbitrable, to hold hearings, make findings of fact, interpret the applicable provisions of the contract and issue injunctions so as to restore the status quo or to otherwise regulate the relationship of the parties pending exhaustion of the arbitration process. This would cut deeply into the policy of the Norris-LaGuardia Act and make the courts potential participants in a wide range of arbitrable disputes under the many existing and future collective-bargaining contracts, not just for the purpose of enforcing promises to arbitrate, which was the limit of *Boys Markets,* but for the purpose of preliminarily dealing with the merits of the factual and legal issues that are subjects for the arbitrator and of issuing injunctions that would otherwise be forbidden by the Norris-LaGuardia Act.

428 U.S. at 410–11, 96 S.Ct. at 3148–3149 (footnotes omitted).

Even assuming injunctive relief might be authorized under the *Boys Markets* case, which I dispute, such relief still should be denied because the employer has failed to demonstrate irreparable harm. *See Detroit Newspaper Publishers Association v. Detroit Typographical Union No. 18,* 471 F.2d 872 (6th Cir. 1972), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2149, 36 L.Ed.2d 687 (1973). Here the so-called strike or slow down was created by the employer's own conduct in suspending employees for violation of a work rule. There exists no parallel decision authorizing injunctive relief under similar circumstances. In my judgment, *Anheuser-Busch* is directly controlling. As Chief Judge Coffin observed:

> Although the district court's findings on injury make reference to the fact that the plant was effectively shut down, an employer cannot be permitted to qualify for injunctive relief simply by responding to minor employee infractions in a way that brings serious and irreparable damage upon himself by causing a shutdown.

511 F.2d at 1099.

The company is willing to suspend enforcement of the work rule pending arbitration; that is, it is willing to suspend enforcement of the rule as long as the union adopts its procedural interpretation of the contract. This in itself should be sufficient to show a lack of irreparable harm. Since the company can prevent the harm by its own conduct, it is incredible to me that the harm is found to be irreparable by the majority. *Anheuser-Busch, Inc. v. Teamsters Local No. 633,* 511 F.2d at 1099.

In any event, the company's willingness to suspend the work rule pending arbitration makes it clear that if this court would order the parties to arbitrate the grievance involved, injunctive relief as to the enforce-

ment of the work rule would not be necessary. It seems to me that this is a much better solution than authorizing a federal court to exercise its jurisdiction in an area where it is both undesirable and unlawful.[2]

**2.** As the Court indicated in *Boys Markets* :

> Our holding in the present case is a narrow one. We do not undermine the vitality of the Norris-LaGuardia Act. We deal only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure. *Nor does it follow from what we have said that injunctive relief is appropriate as a matter of course in every case of a strike over an arbitrable grievance.*

398 U.S. at 253, 90 S.Ct. at 1594. (emphasis added).