ELEVATOR MANUFACTURERS' ASSOCIATION OF NEW YORK, INC., and Otis Elevator Company, Plaintiffs-Appellants,

v.

LOCAL 1, INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS [an unincorporated association], Karl Stork, Thomas Connelly, and all others conspiring, acting in concert or otherwise participating with them or acting in their aid or behalf, Defendants-Appellees.

No. 36, Docket 82–7169.

United States Court of Appeals, Second Circuit.

Argued Sept. 13, 1982.
Decided Sept. 23, 1982.

Charles O. Strahley, New York City (Barbra Alhadeff, Putney, Twombly, Hall & Hirson, New York City, of counsel), for plaintiffs-appellants.

Richard H. Markowitz, New York City, for defendants-appellees.

Before LUMBARD, MANSFIELD and VAN GRAAFEILAND, Circuit Judges.

MANSFIELD, Circuit Judge:

The Elevator Manufacturers Association of New York (EMANY) and Otis Elevator Company (Otis) appeal from an order of the Southern District of New York, 534 F.Supp. 265, Kevin T. Duffy, *Judge*, denying their motion for a preliminary injunction restraining Local 1, International Union of Elevator Constructors (Local 1) and two of its officers (Karl Stork, President, and Thomas Connelly, Business Agent) from engaging in a strike or work stoppage with respect to overtime work in violation of a collective bargaining agreement between them, pending arbitration of an underlying dispute which gave rise to the strike. We reverse and remand for further proceedings.

EMANY, of which Otis is a member, is an association of employers engaged in the business of constructing, repairing and servicing elevators in the New York City metropolitan area. Local 1, a labor organization, is the collective bargaining representative of mechanics and helpers employed by employer-members of EMANY. A collective bargaining agreement between the parties, in effect from July 1, 1981, through June 30, 1984, prohibits strikes or work stoppages by employees and provides for binding arbitration of disputes and grievances with respect to the application and construction of the agreement.[1]

It is undisputed that the prompt servicing of elevators and escalators in emergency situations, particularly after normal working hours, is important to public safety, health and welfare. Such situations can occur, for instance, when buildings are threatened by fire or smoke, when persons in need of medical assistance are trapped in elevators that will not open, when adequate patient care or surgery is interrupted by an elevator failure, or when an elevator breakdown stops production in a plant. For these reasons members of EMANY contract with their customers to provide emergency service on a 24-hour-a-day basis, 7 days a week. For many years past Otis fulfilled this obligation satisfactorily by making available overtime work to employees who would sign up for emergency overtime. The names of the volunteers were placed on

---

1. The pertinent no-strike provisions of the agreement are as follows:

"SECTION XI
STRIKES AND LOCKOUTS
"1. It is agreed by both parties to this Agreement that so long as the provisions herein contained are conformed to, no strikes or lockouts shall be ordered against either party.
"2. No strike will be called against the Employer by Local No. 1 unless the strike is approved by Local No. 1 International Union of Elevator Constructors. Sufficient notice shall be given to the Employer before a strike shall become effective. Except in the case of Contract Service Work as specified in Section VII of this Agreement, work stoppages brought about by picketing or strikes by building trades local unions affiliated with Building Trades Councils shall not constitute a strike within the meaning of this Section.
"3. In the event of a strike, work stoppage or lockout affecting Mechanics and Helpers on New Construction or Repair Work, men working on Contract Service shall not be affected by such strike, work stoppage or lockout and the Union will supply competent men to the Employer to do all work covered under Contract Service whether such men are continuously employed in this work or not prior to the strike, work stoppage, or lockout."

"SECTION IX
ARBITRATION
"All differences and disputes regarding the application and construction of this Agreement ... shall be settled locally between the local Union and the Employer. In the event the matter cannot be settled on a local basis, then either the Union or the Employer shall submit the dispute to the New York Arbitration Committee which it is hereby understood and agreed shall have the power to enforce its decision by mutual consent for protection of the public and the entire elevator industry. Pending the appeal to the New York Arbitration Committee there shall be no stoppage of work, strikes or lockouts."

a "night call list" and in response to calls at night or on weekends from customers the employer would allocate emergency service work to them. This system functioned pursuant to Section VII(E), Pars. 1 and 2 of the collective bargaining agreement, which provided:

### "(E) EMERGENCY CALLBACKS

"1. When an employee is assigned to an emergency callback at any hour of any day other than the single time hours specified under paragraph (C) 1 above, he is to be paid at a rate of one and one-half (1½) times the single time rate for all hours worked and traveled. The Employer shall pay all mileage and out-of-pocket expenses incurred.

"2. It is agreed that, in the mutual interest of the Employer, Employee and the public, the employee has a special obligation to accept assignment to an emergency callback during any hour of any day. It is understood that the obligation on the part of the service men to make overtime callbacks is not intended to impose a mandatory obligation but simply a mutual recognition of responsibility."

In October, 1981, Thomas Connelly, Local 1 Business Agent, complained to Otis that employees on the night call list were not getting enough overtime. Otis informed Connelly that it followed a practice of "screening" after-hours calls from customers, i.e., determining from the customer whether the emergency was of such a nature that it could be serviced during normal working hours of the next regular work day or whether immediate service was desired. In the latter case an employee on the "night call list" would be called, but in the former the service would be deferred until the next business day. Connelly informed Otis that this system was unacceptable to the Union.

A dispute over Otis' rights arose when Otis refused Connelly's request that it change its system. During the course of discussions over the next month Otis contended that it was entitled under the agreement to screen emergency calls. Connelly disagreed, threatening to direct Otis mechanics not to handle any emergency work unless Otis agreed not to screen. Finally, on December 24, 1981, David Dunbar, Local 1 shop steward at Otis' East Orange, New Jersey, office, directed Otis' mechanics not to perform any further emergency work. Connelly allegedly threatened Otis mechanics that if they did perform such work they would be brought up on charges before Local 1. According to Otis, this could result in a fine of $2,000 a day upon any mechanic who disobeyed the order. As a result no Otis employees, despite their having signed up for and performed emergency overtime regularly prior to December 24, 1981, have done such work since that date. On January 5, 1981, Otis requested Local 1 to refer the dispute to the contractual grievance and arbitration procedure under the parties' collective bargaining agreement and to end the work stoppage, which Local 1 refused to do. Thereupon the present action was commenced.

On February 10, 1982, Judge Duffy denied plaintiffs' motion for a preliminary injunction. He recognized that the issue of Otis' right to screen emergency calls was "clearly arbitrable," and that under the Court's decision in *Boys Markets Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Norris-LaGuardia Act's prohibition against enjoining strikes did not prohibit a court from enforcing a no-strike clause by injunction where the grievance giving rise to the strike must be arbitrated under the collective bargaining agreement. However, after questioning whether refusal of overtime violated the no-strike clause, he concluded that this case was governed by the Court's decision in *Buffalo Forge Co. v. United Steelworkers of America,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), which held that a sympathy strike not involving an underlying arbitrable grievance could not be enjoined despite the existence of a no-strike clause in the collective bargaining agreement between the parties.

### DISCUSSION

■ A district court's denial of injunctive relief will be reversed only for abuse of

discretion or an error of law. *Kaynard v. Mego Corp.,* 633 F.2d 1026, 1030 (2d Cir. 1980); *Jack Kahn Music v. Baldwin Piano & Organ,* 604 F.2d 755, 758 (2d Cir. 1979). In the present case the controlling facts, except possibly for the existence of irreparable injury, are not in dispute. Moreover, the decision below rested solely on affidavits, and hence does not involve credibility issues, so that we are in as good a position as the district court to rule on the issue. *Jack Kahn Music, supra,* 604 F.2d at 758; *Dopp v. Franklin Nat'l Bank,* 461 F.2d 873, 879 (2d Cir. 1972). The principal issue is one of law, i.e., whether this case is governed by the Supreme Court's decision in *Boys Markets, supra,* or its decision in *Buffalo Forge, supra.* We believe that it is governed by *Boys Markets,* as further explicated by the Court in *Buffalo Forge* and *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n,* —— U.S. ——, 102 S.Ct. 2673, 73 L.Ed.2d 327 (1982).

A strike or work stoppage claimed to be in breach of contract does not automatically entitle the employer to an injunction. On the contrary, § 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, bars such relief. An exception, however, was carved out by the Supreme Court in *Boys Markets, supra,* where, in recognition of the federal policy favoring arbitration of labor disputes,[2] it held that a strike may be enjoined when it arises out of a grievance that is the subject of compulsory arbitration, provided the usual equitable requirements for preliminary relief are met. In *Boys Markets* the parties were obligated to arbitrate the underlying grievance that was the occasion of the strike, i.e., whether members of the Retail Clerks Union were entitled to perform certain work being done by non-members of their bargaining unit, and the strike was enjoined. See, in accord, *Gateway Coal Co. v. United Mine Workers of America,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). On the other hand, when the parties have not agreed to arbitrate the underlying dispute, as was the case in *Buffalo Forge Co. v. United Steelworkers of America,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), where the issue was whether a sympathy strike violated a no-strike clause, there was no occasion to invoke the policy in favor of compulsory arbitration and, in recognition of the general mandate of § 4 of the Norris-LaGuardia Act, the Court held that such a strike may not be enjoined. Indeed, in *Buffalo Forge* the employer, despite a union offer, refused to arbitrate the issue of whether the sympathy strike breached their contract. Said the Court:

> "*Boys Markets* plainly does not control this case. The District Court found, and it is not now disputed, that the strike was not *over* any dispute between the Union and the employer that was even remotely subject to the arbitration provisions of the contract. The strike at issue was a sympathy strike in support of sister unions negotiating with the employer; neither its causes nor the issue underlying it was subject to the settlement procedures provided by the contracts between the employer and respondents. The strike had neither the purpose nor the effect of denying or evading an obligation to arbitrate or of depriving the employer of its bargain. . . .
>
> "Nor was the injunction authorized solely because it was alleged that the sympathy strike called by the Union violated the express no-strike provision of the contracts." *Buffalo Forge Co. v. United Steelworkers of America, supra,* 428 U.S. at 407–09, 96 S.Ct. at 3147–3148 (emphasis in original).

▮ In short, the mere arbitrability of the issue of whether a strike or work stoppage violates an express or implied no-strike clause does not entitle the employer to "Boys Markets" injunctive relief; there must be an underlying arbitrable grievance. *Id.* at 409–10, 96 S.Ct. at 3148. See, in accord, *Jacksonville Bulk Terminals, Inc. v.*

---

**2.** *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

*International Longshoremen's Ass'n* —— U.S. ——, 102 S.Ct. 2673, 73 L.Ed.2d 327 (1982) (work stoppage in protest against shipment of goods to Soviet Union did not present underlying arbitrable dispute, despite existence of no-strike clause).

In the present case Otis contends that the concerted refusal of members of Local 1, acting pursuant to the Union's directions, to sign up for overtime amounted to a strike in violation of the parties' collective bargaining agreement and that the strike arose out of the underlying arbitrable issue of whether Otis was permitted to screen customers' emergency calls before assigning emergency callback work. Therefore, it argues, the court has jurisdiction to issue a "Boys Markets" injunction. Local 1, on the other hand, argues that the sole question is whether members may, under the terms of Section VII(E)(2) of the agreement, refuse emergency callbacks, and that the case is therefore governed by *Buffalo Forge*, which denied relief where the only arbitrable issue was the applicability of the agreement's no-strike clause. In order to resolve the issue we are of necessity required to engage in a preliminary interpretation of the agreement in the light of the surrounding circumstances. Otherwise it would rarely be possible to decide whether a case is governed by *Boys Markets* or *Buffalo Forge*. We therefore reject Local 1's contrary contention that the issues must be left to arbitration while the concerted refusal to sign up for overtime callback assignments continues. See, in accord, *Kentucky West Virginia Gas Co. v. Oil, Chemical & Atomic Workers*, 549 F.2d 407, 413 (6th Cir. 1977) (preliminary contractual interpretation by court); *National Rejectors Industries v. United Steelworkers of America*, 562 F.2d 1069 (8th Cir. 1977), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1486, 55 L.Ed.2d 517 (1978) (same). Indeed, an injunction should issue only after the court makes a preliminary determination that the strike would violate the no-strike clause and arises out of grievances which the parties are bound to arbitrate. In the present case although arbitration was requested by Otis on January 6, 1982, it has not resulted in an award, and conclusion of the arbitration proceedings may not be expected in the immediate future.

Preliminarily, the concerted refusal of Otis' employees, acting according to the direction of Local 1, to sign up for emergency overtime callback assignments, appears to violate not only the plain "no-strike" provision of the parties' agreement, *supra*, n.1, but also the provisions of Section VII(E)(2). Although that section does not mandate an employee's signing up for such overtime work and simply exhorts employees to do so, stating that the employee has a "special obligation" to do so as a matter of "mutual recognition of responsibility," the provision leaves the matter to the individual employee, uninhibited by union demands or coercion. Ordinarily a concerted refusal to perform "voluntary" overtime work amounts to a "strike" within the meaning of the National Labor Relations Act, 29 U.S.C. § 142(2), which defines a "strike" as including any "concerted stoppage of work [or any] concerted slowdown or other concerted interruption of operations by employees." *Avco v. Local Union # 787*, 459 F.2d 968, 974 (3d Cir. 1972) (union resolution that members refuse voluntary overtime work); *American Ship Building Co. v. Local Union 358*, 459 F.Supp. 491, 493 (N.D.Ohio 1978) (concerted refusal of union membership to accept non-mandatory overtime assignments); *Local No. P–575, and Iowa Beef Packers, Inc.*, 188 N.L.R.B. 5, 6 (1971) ("That the overtime was designated as voluntary in the contract does not ... render the concerted refusal to perform it any less a strike....").

■ Despite an apparent violation of the no-strike provisions of the parties' agreement, the work stoppage here would not be enjoinable unless it grew out of an arbitrable dispute. The grievance which led to the present stoppage is whether Otis may screen emergency calls from customers before assigning overtime work to employees on the overtime call list. In the eyes of Local 1, this screening procedure reduced the amount of overtime that would otherwise be available to the employees, whereas

Otis saw the procedure as a way of improving customer relations by not subjecting customers to needless overtime expense when the call was not truly "emergency" in nature. As the district court recognized, this grievance is clearly arbitrable under the agreement, Section IX of which obligates the parties to arbitrate "[a]ll differences and disputes regarding the application and construction of this Agreement." Should the arbitrator decide this issue in favor of Otis, the grievance underlying the concerted refusal to sign up for overtime would vanish and no basis would exist for the work stoppage.[3] If, on the other hand, the arbitrator decided the issue in favor of the employees, Otis would discontinue its screening procedure and the employees would gain the benefit of the additional work. This case therefore fits within the mold of *Boys Markets* rather than *Buffalo Forge*.

 Nor does the court lack *Boys Markets* jurisdiction because Otis rather than Local 1 requested compulsory arbitration under the parties' agreement. A union may not, by refusing to file a grievance, impede enforcement of the policy in favor of compulsory arbitration which underlies *Boys Markets* since to do so would sacrifice substance for form. *Jacksonville Maritime Association Inc. v. I. L. A.*, 571 F.2d 319, 324–25 (5th Cir. 1978).

 There remains the issue of whether Otis, even though it may have a strong case on the merits and the balance of hardships tips in its favor, can show that the work stoppage called by Local 1 is threatening it with irreparable injury. Otis states that, while it has attempted over the last few months to use supervisors to fill the void caused by Local 1's work stoppage and supervisors now service emergency calls that had always been handled by employees on the "night call list," it has now exhausted these efforts and will be unable to continue doing so indefinitely. According to Otis,

this will lead to inadequate service of customers, loss of business and damage to its good will, reputation and commercial relationships in the industry. However, since the district court did not reach this question other than to point out the importance to the public of emergency elevator service, the case must be remanded for further proof and findings on this issue. In view of the importance of the issue the district court is requested to act promptly in the matter.

We remand the case to the district court for further proceedings in accordance with the foregoing. The mandate is to issue forthwith.

---

**3.** Local 1 concedes arguendo that "the refusal to work overtime callbacks was in some way tied in to the screening issue," but argues that "the underlying issue [of] Otis' right to screen emergency calls" does not resolve the issue of whether the employees have the right under Section VII(E)(2) to refuse overtime callbacks. However, Local 1 offers no reason other than the screening procedure for its direction to the employees not to volunteer for overtime.