776 F.2d 374
 120 L.R.R.M. (BNA) 3187, 103 Lab.Cas. P 11,653
 NATIONAL ELEVATOR INDUSTRY, INC. and Otis Elevator Company,
Plaintiffs, Appellees,
v.
INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS, AFL-CIO,
International Union of Elevator Constructors,
Local 4 and Edward C. Sullivan,
Defendants, Appellants.
 No. 85-1199.
 United States Court of Appeals,
First Circuit.
 Heard Oct. 8, 1985.
Decided Nov. 8, 1985.
 
 Paul F. Kelly, Boston, Mass., with whom Segal, Roitman & Coleman, Boston, Mass., were on brief for Intern. Union of Elevator Constructors, Local 4 and Edward C. Sullivan, defendants, appellants.
 Robert Matisoff, Washington, D.C., with whom O'Donoghue & O'Donoghue, Washington, D.C., were on brief for Intern. Union of Elevator Constructors, AFL-CIO, defendants, appellants.
 Charles O. Strahley, New York City, with whom Michael T. McGrath and Putney, Twombly, Hall & Hirson, New York City, were on brief for plaintiffs, appellees.
 Before COFFIN and BREYER, Circuit Judges, TIMBERS*, Senior Circuit Judge.
 COFFIN, Circuit Judge.
 
 
 1
 This appeal raises several challenges to the issuance of a preliminary injunction against a union's interfering with an employer's "knocking down" temporary mechanics to their permanent status as helpers and engaging in any work stoppage or refusal to work overtime.
 
 
 2
 Plaintiffs-appellees are National Elevator Industry, Inc. (NEII), a multi-employer trade association, which engages in collective bargaining for its members, and Otis Elevator Company (Otis), a member of NEII. Defendants-appellants are International Union of Elevator Constructors (International), and Local 4 of International. International and NEII are parties to a "Standard Agreement", which binds both Otis and Local 4.
 
 
 3
 Early in 1985 Otis had under way thirteen elevator installation projects in the Boston area. The two classes of workers employed were mechanics and helpers who usually worked in teams of one mechanic and one helper. Under conditions of full employment, helpers could be elevated to the status of "temporary mechanics". The critical clause of the Standard Agreement, Article X, Par. 4, stated in part:
 
 
 4
 "A Helper may work as a Temporary Mechanic upon agreement of his Employer and the Union Representative, ... provided he has worked a period of one (1) year and he has complied with the other requirements for temporary mechanics prescribed from time to time by [the National Elevator Industry Educational Program]."
 
 
 5
 At a job site in Cambridge, Otis's Boston area Construction Superintendent Mazur, decided to reduce the number of mechanics (7) by one, and to increase the number of helpers (5) by one. Of the two temporary mechanics among the seven, Mazur "knocked down" one Griffiths to helper on the same job after determining that Griffiths lacked the ability to work more independently, as the position of temporary mechanic on the other work sites would demand.
 
 
 6
 The action occurred on Thursday, January 17. On learning of this, Local 4's business agent, Sullivan, protested to Mazur that two other temporary mechanics at two other work sites were junior to Griffiths, who therefore had been demoted "out of sequence". Sullivan himself testified that he told Mazur, recently assigned from Philadelphia, that in Boston the practice was to "set down" temporary mechanics to helpers in reverse order of their educational progress under the national educational program--those who had completed the fewest educational modules would go first. He said that the other two temporary mechanics had less such schooling than Griffiths. Mazur replied that the Standard Agreement did not require knocking down in any kind of sequence.
 
 
 7
 Sullivan's response was that he "was going to set back all the temporary mechanics at Otis because they had ruined the integrity of the program." He immediately notified all temporary mechanics that they were now helpers. Subsequently, the next day, Otis had to lay off some twelve employees because helpers could only work when paired with a mechanic or a temporary mechanic. On Saturday, Mazur learned that Sullivan had earlier that day been on the Charles Square worksite and a Franklin Street worksite--the two sites where Otis was working on an overtime schedule, had talked with the Otis employees, and that they "had decided among themselves that they would work no further overtime" until "the problem with the temporary mechanics was straightened out." On both sites all nineteen employees left shortly after speaking with Sullivan.
 
 
 8
 Plaintiffs filed their complaint seeking injunctive relief on January 24, a temporary restraining order issued on January 25, and, after hearing, a preliminary injunction issued on February 8.
 
 
 9
 The legal framework for determining whether, despite the Norris-LaGuardia Act, 29 U.S.C. Sec. 104, a labor injunction may properly issue, is established by Boys Market, Inc. v. Retail Clerks, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). As we have summarized it, there are three prerequisites for injunctive relief: "(1) the collective bargaining agreement must contain mandatory arbitration procedures; (2) the strike to be enjoined must be over an arbitrable grievance; and (3) 'ordinary principles of equity' must warrant the injunctive relief." International Detective Service, Inc. v. International Brotherhood of Teamsters, etc. Local 251, 614 F.2d 29, 31 (1st Cir.1980).
 
 
 10
 The first requirement is concededly met. Article XV of the Standard Agreement provides for arbitration of "[a]ll differences and disputes regarding the application and construction of this Agreement...." We add that Article XIV stipulates that "no strikes or lockouts shall be ordered against either party."
 
 
 11
 The second requirement of an arbitrable grievance poses the major issue dividing the parties. Appellees' position is that the arbitrable dispute underlying this controversy is Local 4's disagreement with Otis's action in "knocking down Mr. Griffiths from temporary mechanic to helper status." It would frame the arbitrable issue thusly: "Did Otis violate the Standard Agreement by knocking down Lanford Griffiths? If so, what shall be the remedy?" The district court used a similar formulation: "Does this agreement require an employer to consult with or seek the agreement of the Local before it knocks down any temporary mechanic under Article 10, Paragraph 4."
 
 
 12
 Local 4's position is that Article X, paragraph 4 ("A Helper may work as a Temporary Mechanic upon agreement of his employer and the union representative....") means that no helper can continue to work as a temporary mechanic if either the employer or the union, for any reason, withdraws its consent. It therefore says "with positive assurance" that Otis had the right to knock down Griffiths, although it was not the better part of wisdom to do so. By the same token, it says that it also had the contract right to take back its consent on all the other temporary mechanics. It contends in essence that its resort to the blunt weapon of economic power could not be enjoined because there was no grievance to arbitrate, only a basic policy dispute not covered by the Standard Agreement.
 
 
 13
 The argument is flawed in several ways. In the first place, Local 4 would invoke, to resolve the dispute, "an agreement which exists outside the Standard Agreement and which does not contain ... an arbitration clause." But Article XXIII of the Standard Agreement states: "This agreement defines the entire relationship between the parties...."
 
 
 14
 Moving on to more basic matters, we are unable to accept the premise of the Local that the only way to read paragraph 4 of Article X is that the requirement of joint company-union agreement to upgrade a helper to a temporary mechanic implies that the temporary status ceases whenever either party withdraws its consent. Such a reading is possible. But it is also possible to read it as speaking only to the prerequisite for the initial decision to upgrade. For it does not necessarily follow that the same considerations that attend the decision to elevate a helper to the status of temporary mechanic, e.g., a shortage of permanent mechanics and the suitability of a specific helper, would also control a decision to "knock down" a temporary mechanic. Unilateral power to withdraw consent would enable the company to remove a temporary mechanic who had proven inadequate; it would enable the union, however, to remove at any time a temporary mechanic whose skill and experience on a particular job had made him indispensable, even though no other suitable replacement was available.
 
 
 15
 It seems to us that the lack of specific ground rules for "knocking down" is the kind of interstitial gap that grieving and arbitration are designed to fill. An arbitrator might conceivably hold that joint consultation was required prior to declassifying or that seniority in schooling was the determining consideration. But an arbitrator might hold that management could decide on the basis of its judgment as to the capabilities of the employee, or that the company could insist on continuing the status of temporary mechanic at least for the duration of the job or as long as there was a shortage of permanent mechanics. There may well be other approaches, derived from negotiating history, local practice, or national "law of the shop".
 
 
 16
 Another reason occurs to us for rejecting Local 4's theory. Its rationale goes far toward aborting "the very purpose of arbitration procedures ... to provide a mechanism for the expeditious settlement of industrial disputes without resort to strikes, lockouts, or other self-help measures." Boys Markets v. Clerks Union, supra, 398 U.S. at 249, 90 S.Ct. 1591. The essentiality of being able, in a tight labor market, to elevate helpers to temporary mechanic status--and to keep them in such status as long as job and market conditions require--is obvious. For the union to have an unrestricted right to veto the wish of the company to maintain helpers in the temporary mechanic status is to have a wild card which can be exercised at pleasure no matter what issue may arise. If, for example, a union were to desire a holiday in addition to those recognized in the collective bargaining agreement, it need only withdraw its consent to all temporary mechanics. Under Local 4's theory, no injunction could issue, for the issue of an extra holiday would not be arbitrable and its right to withdraw consent would be simply the exercise of a contractual right to bring about a change in company policy.
 
 
 17
 In short, we view Local 4's attitude of "Otis had the power to knock down Griffiths; we have the power to knock down all other temporaries" as an Open Sesame to "Eye for an eye". We hold that there was an arbitrable grievance and that appellees' formulation of the issue to be arbitrated is adequate: "Did Otis violate the Standard Agreement by knocking down Lanford Griffiths? If so, what shall be the remedy?"
 
 
 18
 Local 4, in addition to arguing that there was no arbitrable dispute, also argues that there was no strike. When the union "pulled the cards" of all temporary mechanics, it not only effectively withdrew these employees from the skilled work they were doing, but in so doing it also forced the layoff of helpers. In addition, the court could supportably draw the inference from the facts that mechanics at the Franklin Street and Charles Square job sites had regularly been working overtime, that all scheduled employees had reported for overtime work on Saturday, January 19, and that immediately after Business Agent Sullivan spoke to them on each job site they all left work, that Local 4 through its agent had in real terms called a strike. Cf. Elevator Manufacturers' Ass'n of New York v. Local 1, IUEC, 689 F.2d 382 (2d Cir.1982).
 
 
 19
 The third requirement of Boys Market, the justification of injunctive relief on the basis of ordinary principles of equity, is also met. The district court was not clearly erroneous in holding that a number of job sites were adversely affected and others would likely be so affected, with consequent damage to Otis's reputation, or that neither the union nor Griffiths would suffer harm as a result of the injunction.
 
 
 20
 Two other contentions must be dealt with. Local 4 argues that the district court erred in framing its injunction to include "all others conspiring ... with [defendants]", because this language impermissibly includes individual union members. Considerable time during oral argument was devoted to this issue. We deem this tactic most inexcusable, the point never having been brought to the attention of the district court. Not only was the same phraseology used without objection in the initial restraining order, but the proposed text of the injunction was given to counsel for Local 4, who replied to appellees' counsel, making a number of specific points, but not alluding to the present argument. We hold that the issue has been waived.
 
 
 21
 The International makes a better point. It argues that it should not be included in the injunctive order because there is no evidence that it actively participated in or ratified the acts of Local 4. Abreen Corp. v. Laborers, 709 F.2d 748, 757 (1st Cir.1983). The only reason for belatedly adding the International as a party enjoined was counsel's statement at a hearing that "if the company can do what it did do in this case, the International would support Local 4's rights to withdraw its consent to these, other temporary mechanics". This, however, is clearly a statement of present opinion about legal rights, not evidence of past involvement or a historic ratification of actions taken. We therefore vacate the injunction insofar as it purports to cover the International.
 
 
 22
 The order issuing the injunction is affirmed in all respects except its inclusion of the International Union of Elevator Constructors; as to this the injunction is reversed. Costs to appellees.
 
 
 
 *
 Of the Second Circuit, sitting by designation