**DETROIT NEWSPAPER PUBLISHERS ASSOCIATION et al., Defendants-Appellants,**

v.

**DETROIT TYPOGRAPHICAL UNION NO. 18, INTERNATIONAL TYPO-GRAPHICAL UNION, Plaintiff-Appellee.**

No. 72-2156.

United States Court of Appeals, Sixth Circuit.

Dec. 20, 1972.

Andrew M. Kramer, Chicago, Ill., for defendants-appellants; John Corbett O'Meara, Detroit, Mich., Frank H. Stewart, Cincinnati, Ohio, on brief for defendants-appellants, The Detroit News, Detroit Newspaper Publishers Assn. and The Detroit Free Press; Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., Dickinson, Wright, McKean & Cudlip, Detroit, Mich., Taft, Stettinius & Hollister, Cincinnati, Ohio, of counsel.

Sheldon Klimist, Miller, Klimist, Cohen, Martens & Sugarman, Detroit, Mich., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, and PECK and MILLER, Circuit Judges.

PHILLIPS, Chief Judge.

This is an appeal under 28 U.S.C. § 1292(a)(1) from the granting of a preliminary injunction in a labor dispute.

Detroit Typographical Union No. 18 (the Union) is the bargaining representative of certain employees of Detroit's two daily newspapers, The News and The Free Press. The current collective bargaining agreement between the parties was signed June 18, 1971, and by its terms will remain in effect through June 17, 1974.

The Detroit News is constructing a publishing building outside the city,

which will house its production facilities now located in downtown Detroit. The news gathering and editorial offices will remain downtown. The distance between the downtown offices and the new plant will be approximately twenty-three miles.

The underlying dispute between the parties grows out of the decision of the newspaper to utilize new electronic editing equipment known as CRT. Both the new and the replaced equipment serve the function of converting typewriter copy into a computer tape which sets the type for printing the newspapers. The Detroit News has directed that the CRT equipment be operated by editorial personnel rather than by composing room employees, members of the Union, who have been operating the replaced equipment.

On or about September 26, 1972,[1] the Detroit News informed the Union of its plan to use the new equipment and that it would not be operated by composing room employees represented by the Union. The Union took the position that the operation of this equipment by personnel other than composing room employees to prepare computer input or tapes for publication would be a violation of the collective bargaining agreement. The Union conceded that management could use the new equipment for test purposes only, but not for live publication.

Applicable parts of the collective bargaining agreement, including the "status quo" provisions of § 10(b), are set forth in the appendix to this opinion.

By letter dated October 2 the Detroit News informed the Union that a dispute existed pursuant to the collective bargaining agreement and that the dispute was being submitted to the Joint Standing Committee, consisting of representatives of the Publisher and the Union. This Committee met on October 12 but was unable to resolve the dispute. By letter dated October 23 addressed to the Union the Detroit News initiated arbitration of the dispute in accordance with the collective bargaining agreement. The issue of whether employees other than those represented by the Union can operate the electronic editing equipment for the preparation of computer input or tapes for live publication is currently in the process of being arbitrated. During arbitration the newspaper is continuing with the installation of the equipment.

On October 30 the newspaper requested members of the Union to use the new equipment for live production, that is, for newspaper publication.

The tape was run as requested, but the Union on the same day sent the following telegram to the Detroit News:

"YOUR DECISION TO USE THE TAPE AND/OR COMPUTER INPUT CREATED BY TED DOUGLAS, NEWS STAFF WRITER, FOR THE 11:30 a. m. EDITION ON OCTOBER 30, 1972, IS A VIOLATION OF SECTION 47 and 48 OF THE AGREEMENT. THE USE OF SUCH TAPE AND/OR COMPUTER INPUT IS A VIOLATION OF SECTION 10(b) 'STATUS QUO' AND YOU ARE REQUIRED TO CEASE THE USE OF SUCH TAPE AND/OR COMPUTER INPUT UNTIL THIS DISPUTE IS RESOLVED UNDER THE TERMS OF THE AGREEMENT."

Upon receiving this telegram, the newspaper sent a telegram to the Union expressing disagreement with the Union's position that the "status quo" clause of the agreement was applicable to the dispute. In this telegram the newspaper stated its willingness to resolve the dispute regarding the applicability of the "status quo" clause through the appropriate arbitration procedure set forth in § 10 of the collective bargaining agreement.

On October 31 the Union filed its complaint initiating the present litigation under Title III, § 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, praying for a preliminary injunction and permanent injunction. The

---

1. All dates hereafter mentioned in this opinion are 1972.

complaint alleged that the Union and its members would suffer irreparable harm unless an injunction was granted restraining the newspaper from utilizing the electronic editing equipment pending an arbitrator's determination of the grievance filed by the Detroit News on October 2. A hearing was held before the District Court November 2 on the Union's application for a preliminary injunction. On November 14 the District Court rendered an oral opinion from the bench in favor of the Union and entered an order enjoining the Detroit News from utilizing the electronic editing equipment for other than test purposes unless it is operated by the composing room employees represented by the Union. This injunction by its terms will remain in effect pending a determination by arbitration of the underlying dispute. The District Court held that the newspaper has violated the "status quo" clause of the contract.

This appeal is from the order granting the injunction. We reverse.

The newspaper filed in this court a motion for stay pending appeal. Oral argument on the motion to stay was heard by a judge of this court on November 24. The appeal thereupon was advanced for hearing on the merits on December 1, and the motion to stay was referred to the hearing panel. Since we reverse the decision of the District Court on the merits, it is not necessary to act upon the motion to stay.

■ Under the principles enunciated by the Supreme Court in the Steelworkers trilogy,[2] arbitration is favored as a means of resolving labor disputes. Under a collective bargaining agreement providing for binding arbitration, it is not the province of the courts to determine issues of fact which bear upon the question of whether a particular section of the contract has been violated. This is the function of the arbitrator. Amer-

ican Radiator & Standard Sanitary Corp. v. Local 7 of the International Brotherhood of Operative Potters, AFL–CIO, 358 F.2d 455, 458 (6th Cir. 1966). *See also* John Wiley & Sons v. Livingston, 376 U.S. 543, 558, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

■ It was not the prerogative of the District Court to construe the "status quo" clause of the contract or to make a factual determination as to whether there has been a violation of this clause. We see no reason why this issue, along with the basic underlying dispute between the parties, cannot be determined by arbitration.

■ The fatal defects in the decision of the District Court were: (1) its failure to weigh the equities between the parties and to determine whether the employer would suffer more from the granting of the injunction than the Union from its denial, as required by Boys Markets Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 254, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); and (2) the absence of a showing of irreparable harm to employees as mandated by *Boys Markets*.

In *Boys Markets* the Supreme Court adopted the following principles for the guidance of District Courts in determining whether to grant injunctive relief in labor disputes:

"A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect;

2. United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity— whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance." (Emphasis in original.)[3] 398 U.S. at 254, 90 S.Ct. at 1595.

In his bench opinion in the present case the District Judge did not weigh the equities as between the newspaper and its employees or make any determination as to whether the employer would suffer more from the granting of the injunction than the Union from its denial. Further, the District Court announced only a bare conclusion as to irreparable harm and failed to make findings of fact to support this conclusion. *See* Lauf v. E. G. Shinner & Co., 303 U.S. 323, 330, 58 S.Ct. 578, 82 L.Ed. 872 (1938).

 In the above quoted language of *Boys Markets*, the Supreme Court emphasized that the District Court must consider whether issuance of an injunction would be warranted under "ordinary principles of equity." These principles are described by Professor Wright as follows:

"The classic principles governing availability of injunctions were summarized by Justice Baldwin, sitting at circuit, in 1830: 'There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more

dangerous in a doubtful case, than the issuing an injunction; it is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages. The right must be clear, the injury impending or threatened, so as to be averted only by the protecting preventive process of injunction: but that will not be awarded in doubtful cases, or new ones, not coming within well established principles; for if it issues erroneously, an irreparable injury is inflicted, for which there can be no redress, it being the act of a court, not of the party who prays for it. It will be refused till the courts are satisfied that the case before them is of a right about to be destroyed, irreparably injured, or great and lasting injury about to be done by an illegal act; in such a case the court owes it to its suitors and its own principles, to administer the only remedy which the law allows to prevent the commission of such act.'

"To this day courts continue to stay their hand until there has been a clear showing of irreparable injury for which there is no other adequate remedy." 3 Barron & Holtzoff, Federal Practice and Procedure (Wright Ed.) § 1431.

 The fact that this case involves an injunction against the employer does not mean that the District Court was free to ignore the procedural mandates set forth in § 7 of the Norris-LaGuardia Act or to grant an injunction in the absence of irreparable harm. *See* United States Steel Corp. v. United Mine Workers of America, 456 F.2d 483 (3rd Cir.), cert. denied, 408 U.S. 923, 92 S.Ct. 2492, 33 L.Ed.2d 334 (1972); Local 205 v.

3. The above language was adopted by the court from the dissenting opinion of Mr. Jusice Brennan in Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 228, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962). *Boys Markets* overruled *Sinclair*, which had held that the anti-injunction provisions of the Norris-LaGuardia Act precluded a federal district court from enjoining a strike in breach of a no strike obligation under a collective bargaining agreement, even though that agreement contained binding grievance arbitration provisions enforceable under § 301(a) of the Labor Management Relations Act of 1947.

General Electric Co., 233 F.2d 85 (1st Cir.), aff'd, 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1956); Clune v. Publishers Association of New York City, 214 F.Supp. 520, 528 (S.D.N.Y.), aff'd, 314 F.2d 343 (2d Cir. 1963).

■ ■ Not only did the District Court fail to make findings of fact showing irreparable harm; the evidence before the District Judge fails to establish irreparable harm to the Union or the employees. The only injury to composing room employees disclosed by the evidence is a probable loss of overtime, which does not, in our opinion, constitute irreparable harm. Whether employees have suffered a financial loss in the form of reduced overtime and the remedy therefor will be a matter to be determined by the arbitrator.

Robert C. Nelson, operations manager for the Detroit News, testified that no employees will be laid off before April 1, 1973, because of the use of the new equipment.

■ The Union contends that the irreparable injury to it is not the loss of jobs or wages, but the loss of its bargain with the employer on the "status quo" provision. The Union argues that the "status quo" clause does for it what the no-strike clause does for the newspaper, and that the violation of the "status quo" clause has resulted in destroying this equality of position which is the essence of the collective bargaining agreement. The Union asserts that the resulting damage is not financial but is the consequent appearance to its members that the Union is helpless to discharge its obligations, which is its essential duty and function, and that this loss of confidence of the members would be irreparable. The District Court made no finding that this constitutes irreparable harm, and we do not consider that it could be construed as irreparable harm on the basis of the record in this case. There is no suggestion that the Union is in danger of losing its status as bargaining representative or of suffering a reduction of membership. Like

the other phases of the dispute, we hold that the matter of injury to the Union is an issue for determination by the arbitrator.

Although the record does not establish irreparable harm against employees, there is testimony showing substantial injury to the newspaper by the issuance of the injunction. Mr. Nelson testified as follows:

"Q. Mr. Nelson, as operations manager for the News, what would be the effect on operations, if any, in the event that the company would not be permitted now to use the electronic editing system on live material for the next five or six months?

"A. You would have quite a serious effect. First of all, we have a substantial capital investment already made in this equipment. We have a substantial amount of money that is contracted to be spent for the equipment as it is delivered. We certainly would not be able to utilize it to the best advantage of our editorial product. This system allows us to turn out a better editorial product. If anything, it would probably drop back. The time that would be required even trying to go to an alternate system and the moneys involved would be very substantial. We certainly don't have much time. We're not talking about much time at all. And the use of any other system is going to result in nothing but duplication of work, a form of feather-bedding to me it would be a very serious thing."

As heretofore emphasized, the record discloses no weighing of the equities by the District Court as to whether the employer would suffer more harm from the granting of the injunction than the employees from its denial.

In this opinion we do not hold that an injunction could never issue under a "status quo" provision. We hold merely that the injunction was not issued prop-

erly under the facts of this case, where the necessary prerequisites have not been met.

The order of the District Court granting the injunction is reversed. This reversal is without prejudice to any future proceeding that may be instituted seeking an injunction to restrain the Detroit News from terminating any employees as a result of the utilization of the electronic editing equipment pending the arbitrator's determination as to the applicability of the "status quo" clause and the right of the newspaper to utilize this equipment.

## APPENDIX

## JOINT STANDING COMMITTEE

Section 10. (a) Immediately after consummation of this Agreement a Joint Standing Committee of four members shall be appointed, two members of said committee to be named by the Publishers, and two members by the Union. In case of a vacancy on the Joint Standing Committee from any cause, said vacancy shall be filled immediately by the appointment of a new member by the party in whose representation on the Joint Standing Committee the vacancy occurs.

(b) To the Joint Standing Committee shall be referred for settlement all disputes arising out of the operation of this Agreement and all disputes regarding the interpretation of any portion of this Agreement. When a difference arises as to the interpretation and application of any provision of this Agreement, the wages, hours and working conditions prevailing prior to the change out of which the difference arose, shall be preserved unchanged pending decision by the Joint Standing Committee. There shall be no interruption and work in the composing room shall continue until a decision is rendered. The foregoing does not require reinstatement of a discharged employee pending a decision. The Joint Standing Committee must meet within ten days (two [2] days in discharge cases) from the date

on which either party hereto, through its authorized representatives, notifies the other party in writing that a meeting is desired, and shall proceed forthwith to settle any question before it. Such decision to be final and binding on both parties to this Agreement.

(c) If the Joint Standing Committee cannot reach an agreement on any dispute, including disputes regarding discharged men, within ten (10) days (this time may be extended by agreement) from the date on which the dispute is first considered by it, at the request of either party hereto they shall select a fifth member from a panel of three arbitrators, to be selected by agreement of the parties within thirty days after the signing of this Agreement, who shall act as chairman. The Committee shall proceed with all dispatch possible to settle the dispute. It shall require the affirmative vote of at least three of the five members to decide the issue, and the decision in all cases shall be final and binding on the parties hereto. The decisions shall be signed by all members of the Committee, but is legal and binding when signed by a majority. Provided, Local Union Laws not affecting wages, hours or working conditions and the 1971 General Laws of the International Typographical Union shall not be arbitrated.

(d) If a discharged employee be reinstated by the Joint Standing Committee or Board of Arbitration either the Committee or the Board has jurisdiction to determine if there shall be pay for lost time, and if so, the amount thereof.

Section 11. (a) All employees who have completed five (5), or more, years of continuous service in one office as of December 31 of any year shall be entitled to vacation credits in the amount of one-eleventh ($\frac{1}{11}$th) of wages earned the preceding calendar year, such vacation in no case to exceed twenty (20) days.

(b) All other employees covered by this Agreement shall be entitled to vacation credits in the amount of one-sixteenth ($\frac{1}{16}$th) of wages earned the pre-

ceding calendar year, such vacation in no case to exceed fifteen (15) days.

(c) Vacation credits may be liquidated only in the calendar year following the calendar year in which they are earned. Provided, in cases of withdrawal from the office prior to December 31 of any year, accrued vacation credits of that calendar year shall be paid to the employee at the time of termination of employment on the basis of one-eleventh (1/11th) of a day's pay credit for each day's pay earned during that year, or one-sixteenth (1/16th) of a day's pay credit for each day's pay earned during that year, as the case may be.

(d) In case employment ceases because of death of employee the value of accrued vacation credits shall be paid to the heir-at-law of the deceased.

(e) Fractional credits may not be carried forward from one year to another.

(f) No employee will be allowed to forego vacation or any part thereof in any calendar year for the purpose of adding to the length of vacation of any succeeding year.

\* \* \* \* \* \*

Section 47. (a) Both parties to this Agreement recognize Teletypesetter and/or Electro-Typesetter equipment and method of operation, including tape perforator and recutter units, tape box and control board in the production of type, as being within the jurisdiction of the Union.

(b) The Union agrees that operation and maintenance of the reperforator and teleprinter units (used in conjunction with and by the Editorial Department) which the Publishers lease from the AP or UPI, or other recognized news services or syndicates, and which are used by said news services to furnish the Publishers with the daily news report, is not composing room work within the jurisdiction of the Union. The provisions of this paragraph are not to be construed to conflict with the Union's jurisdiction over the operation of keyboard perforators and other equipment as herein provided.

(c) The Publishers may use and employees covered by this Agreement will process:

(1) Tape received from any source which is used for experimental research or test purposes only, and not for publication;

(2) Tape produced by employees covered by this Agreement, and

(3) Markets tabulations, markets fillers, markets tables, sport news and scores of sporting events transmitted by leased wire by the Associated Press, or United Press International News Service in the form of teletypesetter perforated tape. All other tape must be perforated by employees covered by this Agreement.

(d) Teletypesetter and/or Electro Typesetter casting units shall be tended by journeymen or apprentices, in their last two (2) years in a ratio of not more than one (1) to three (3).

(e) It is agreed by both parties hereto that manual operation of linecasting machines (without the use of tape-operated units) may be used on all production for the Publisher's newspaper at his option.

Section 48. When a computer is performing composing room work, the jurisdiction of the Union includes the preparation of input and all handling of output, operation of the computer and all input and output devices, programming (except that programming which is provided by the manufacturer or lesser as part of the standard services for the lease or purchase of the equipment), and maintenance of all the foregoing equipment and devices.