INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, et al., Plaintiffs,

v.

LESTER ENGINEERING COMPANY, Defendant.

No. C82–875.

United States District Court, N.D. Ohio, E.D.

April 22, 1982.

David Roloff, Stokes & Green, Cleveland, Ohio, for plaintiffs.

Charles T. Price, Thomas M. Seger, Baker & Hostetler, Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

KRENZLER, District Judge.

This matter came before the Court on plaintiffs', the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW and Local No. 1051 (hereinafter "Union") motion for a Temporary Restraining Order and Complaint with Request for Preliminary Injunction. Plaintiffs seek injunctive relief to prevent defendant Lester Engineering Company (hereinafter "Company") from selling or otherwise alienating tools, equipment or machinery located at one of its company-owned plants (hereinafter

"Plant No. 2") until such time as a previously filed grievance has been arbitrated.

An informal hearing was held on plaintiffs' motion for a temporary restraining order on March 26, 1982. All parties were represented at this hearing. By agreement of the parties, a Temporary Restraining Order was issued in order to maintain the status quo until further Order of the Court.

On March 29, 1982, a hearing on plaintiffs' Complaint requesting a preliminary and permanent injunction was held. Both parties presented exhibits and live testimony to the Court.

## FINDINGS OF FACT

Based upon the record before it, the Court makes the following findings of fact:

Lester Engineering Company, defendant, primarily manufactures aluminum die cast machines for the automotive and housing industries.

Plaintiffs, the Union, and defendants, the Company, are parties to a collective bargaining agreement (hereinafter "Agreement"). The Agreement contains the terms and conditions of employment for all production and maintenance employees employed at the Company's facilities.

In parts relevant to this case, the Agreement provides:

"The Company shall exercise its functions of management under which it shall have the right ... to decide the number and location of its plants; products to be manufactured; and the methods and processes of manufacturing...." Article IV, Section 4.1.

"When any department is scheduled for less than a forty (40) hour week, operations which are normally performed in that department will not be removed from the plant, provided the work is normally performed within the agreed standard hours. And provided, further, that if the work is to be performed on a machine other than that on which the operations are normally performed, the work can be performed within the general range of time in which the work is normally performed.

* * * * * *

"(d) The Company will not undercut the Union or cause improper impact of any substantial kind upon bargaining unit work, and Management will demonstrate good faith to its employees before subcontracting any work, contrary to Section 5.5." Article V, Section 5.5 (hereinafter "Subcontracting Clause").

"Should a grievance arise, it shall be handled in the following manner:

"Step 1. Within five (5) calendar days after the employee or the Union knew or should have known of the existence of the grievance, the aggrieved employee ... shall take the grievance up with the foreman... [who] shall have one work day to answer the grievance in writing. If it is not so settled, it shall proceed to Step 2.

* * * * * *

"Step 3. ... Any grievance ... may only be processed through arbitration (Step 4) by the Union, and then only if such grievance has been processed in accordance with the procedures set forth in Steps 1, 2, and 3 of this grievance procedure." Article VII, Section 7.2 (hereinafter "grievance procedure").

It is undisputed that on or about February 2, 1982, plaintiffs filed a grievance protesting the subcontracting of bargaining unit work in violation of the subcontracting clause of the Agreement. *See Article V, Section 5.5, supra.* This grievance has been processed through the initial steps of the grievance procedure and is now awaiting scheduling before an arbitrator.

The Company's sole witness, Mr. Harrison, General Manager, testified that due to the decline in its business, the Company made the business decision to consolidate its operations and to liquidate some of its assets. Prior to this decision, over one-half of the Company's salaried employees had been laid off.

As part of this consolidation effort, Mr. Harrison testified that as early as November and December of 1981, the Employer was negotiating a sale of thirteen of the twenty machines then operating at Plant No. 2. Also, as part of the plan, the remaining machines were to be transferred to Plant No. 1. Mr. Harrison further testified that on or about February 24, 1982, the Company received partial payment on the sale of the thirteen machines.

It is not controverted that during the last week in February of 1982 the Company met with the Union and informed the Union that it was closing Plant No. 2. The Company explained that it planned to move some equipment to Plant No. 1 and that it had already sold the rest of its equipment. The Company further indicated that it was in the process of selling Plant No. 2 and the property surrounding it.[1]

It is not disputed that on March 2, 1982, the Company notified all employees of the closing of Plant No. 2 in a shop meeting and by a newsletter posted on bulletin boards and sent to each employee.

On March 10, 1982, the Union filed an unfair labor practice charge against the Company, claiming a failure to bargain over the effects of the plant closure and requesting that the National Labor Relations Board (hereinafter "NLRB") seek injunctive relief against the Company. This charge was later withdrawn.

On March 25, 1982, the Company removed three machines from Plant No. 2. It is not disputed that the Company intends to remove the remaining ten machines that were sold, to move seven machines to Plant No. 1, and also that between seven to ten employees will be laid off as a result of this action.

On March 29, 1982, during recess of the hearing on this matter, the plaintiffs filed a subsequent grievance protesting the closing and the sale of Plant No. 2.

■ Article VII, Section 7.2 of the Agreement provides that the Union must file any grievance within five (5) calendar

days after the Union knows of the existence of the grievance. The uncontroverted evidence indicates that plaintiffs were notified of the Company's decision to close Plant No. 2 prior to March 2, 1982 and that the employees were notified of the decision to close on March 2, 1982. Thus, any grievance concerning the plant closing must have been filed no later than March 7, 1982.

■ Due to the fact that this subsequent grievance protesting the plant closing was untimely, the underlying dispute is barred from arbitration. *See Grocery and Food Products Warehouse Employees Union Local No. 738 v. Thompson Taylor Spice Co.,* 214 F.Supp. 92 (N.D.Ill.1963).

Thus, the issue before this Court is whether the decision to close Plant No. 2 and the sale and removal of certain machines in Plant No. 2 is a violation of the subcontracting clause of the Agreement such that the Union is entitled to an injunction. For the reasons set forth below, this Court finds that the decision to close Plant No. 2 and the subsequent removal of certain machinery from Plant No. 2 in no way violates the subcontracting clause of the agreement, and that, therefore, an injunction, under the facts of this case, is not warranted.

## CONCLUSIONS OF LAW

Jurisdiction over this matter is conferred by Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), which section reads as follows:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

1. A purchase agreement was in fact entered into

for the sale of that property on March 17, 1982.

■ The Union seeks an injunction prohibiting the Company from selling, transferring or removing machinery from Plant No. 2 in connection with the closing and sale of that plant. The Union relies upon *Local Lodge No. 1266, International Association of Machinists v. Panoramic Corp.,* 668 F.2d 276 (7th Cir.1981), which held that an injunction to preserve the *status quo* pending arbitration may, in certain circumstances, be issued against an employer. Whether such an injunction would be permitted in this Circuit is not clear. *See Detroit Newspaper Publishers Association v. Detroit Typographical Union No. 18,* 471 F.2d 872 (6th Cir.1972), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2149, 36 L.Ed.2d 687 (1973). But even if a *status quo injunction* were permitted in this Circuit, the Union would still be precluded from such an injunction under the facts in this case. In the *Panoramic* case, the Court listed four prerequisites to the issuance of a *status quo injunction.* The first prerequisite is that the contract dispute is arbitrable. The grievance underlying the instant action concerns the decision to close Plant No. 2 and the sale and removal of certain machinery in the plant as a result of the decision to close. This dispute, having been untimely filed, is procedurally barred from arbitration. In the absence of a valid, timely-filed arbitrable grievance, the possibility of the Union obtaining injunctive relief "in aid of arbitration" is foreclosed.

The Sixth Circuit in *Mason County Medical Association v. Knebel,* 563 F.2d 256 (6th Cir.1977) has enumerated four prerequisites that must be established before an *equitable injunction* may be issued:

1. a strong likelihood of success on the merits;

2. irreparable injury to the plaintiffs;

3. no substantial harm to others;

4. the public interest would be served by issuing the requested injunction.

The first prerequisite requires that plaintiffs demonstrate a strong showing of success on the merits. In determining the probability of success on the merits, the Court must look to the Agreement and applicable case law.

Upon review, the Court finds that there is nothing in the Agreement to preclude a partial plant closure; nor is there anything in the Agreement which requires negotiations between the Company and the Union concerning the decision to close a plant. Rather, the only provision in the Agreement which deals with a plant closure is found in the management rights section, Article IV, Section 4.1, *supra.* This section unequivocally gives management the exclusive right, in its sole discretion, to close one of the Company's plants.

Further, in *First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), the Supreme Court held that employers have no obligation to bargain with the unions over its decision to shut down part of the company's business. Specifically, the Supreme Court concluded that: "... the harm likely to be done to an employer's need to operate freely in deciding whether to shut down part of its business purely for economic reasons outweighs the incremental benefit that might be gained through the union's participation in making the decision." *Id.* at 686, 101 S.Ct. at 2584.

The Union has argued that they have a right under the subcontracting clause, *supra,* to prevent the Company from closing one of its plants and selling its assets despite the language in the management rights section of the Agreement.

■ It is this Court's view that we are not faced with the issue of determining whether the management rights clause supercedes the subcontracting clause of the Agreement. These clauses are separate and independent of each other. The fact that one of the Company's plants has been closed does not violate the Union's rights under the subcontracting clause. The Company remains in business and the Agreement with its subcontracting clause provision is still binding. Any grievance concerning the subcontracting provision is still viable. It follows, then, that the Union

cannot meet its burden of establishing a substantial likelihood of success on the merits.

Further, the Union has failed to show that it will be irreparably injured if injunctive relief is not granted in the form of restraining the Company's closure and sale of certain machinery in Plant No. 2.

 After the closure of Plant No. 2 and the sale and removal of certain machinery located in that plant, the Union's bargaining unit will still continue to exist at Plant No. 1 and the Union and Company will still be able to process a timely subcontracting grievance. There is nothing to prevent the legal remedy of awarding back pay for hours lost in the event the arbitrator should find that the Company violated the subcontracting clause of the Agreement. Therefore, the Union will not suffer irreparable injury. Further, it is axiomatic that where there is an adequate remedy at law, no injunction will lie.

Finally, a balancing of the equities falls in favor of the Company. Mr. Harrison, the General Manager of the Company, testified that the decision to close Plant No. 2 was due to the present economic situation. There is nothing in the record to contradict this purpose. Negotiations and purchase agreements have already been entered into. Any interference with these transactions could conceivably cause the Company and others to suffer substantial harm due to an inability of the Company to perform its obligations under contracts already entered into. Plaintiffs have thus failed to meet the third and fourth prerequisites for the issuance of injunctive relief.

Therefore, Plaintiffs' request for a preliminary and permanent injunction is denied. Since the sole remedy requested in Plaintiffs' Complaint is injunctive relief and this Court has denied this relief, the Complaint is also hereby dismissed.

IT IS SO ORDERED.