LAPEER COUNTY MEDICAL CARE FACILITY; Eaton County Medical Care Facility; Shiawassee County Medical Care Facility; Maple Lawn Medical Care Facility; Gogebic County Medical Care Facility; Tuscola County Medical Care Facility; Allegan County Medical Care Facility; Calhoun County Medical Care Facility; Oceana County Medical Care Facility; Thornapple Manor; Bay County Medical Care Facility; Jackson County Medical Care Facility; The Maples; Emmet County Medical Care Facility; Marquette County Medical Care Facility; Iron County Medical Care Facility; Hillsdale County Medical Care Facility; Manistee County Medical Care Facility; Cass County Medical Care Facility; Iosco County Medical Care Facility; Huron County Medical Care Facility; Houghton County Medical Care Facility; Grand Traverse Medical Care Facility; Ingham County Medical Care Facility; and Pinecrest Medical Care Facility, on their behalf and on behalf of all similarly situated Michigan county medical care facilities, Plaintiffs,

v.

STATE OF MICHIGAN Through its DEPARTMENT OF SOCIAL SERVICES; Gerald Miller, Director of the Department of Social Services; and Eileen Ellis, Acting Director of Medicaid, Department of Social Services, Defendants.

No. 1:91–CV–333.

United States District Court, W.D. Michigan.

May 20, 1991.

---

Mark R. Smith, Steven K. Girard, Douglas W. VanEssen, Clary, Nantz, Wood, Hoffius, Rankin & Cooper, Grand Rapids, Mich., for plaintiffs.

Janis Meija, R. John Wernet, Jr., William R. Morris, Asst. Attys. Gen., Frank J. Kelley, Atty. Gen., Lansing, Mich., for defendants.

Duane F. Ice, Ronald C. Engler, Miller, Cohen, Martens & Ice, P.C., Southfield, Mich., for amicus curiae.

## OPINION

ENSLEN, District Judge.

This case is before the Court on plaintiffs' motion for a preliminary injunction. The underlying complaint is an action brought by 23 Michigan County Medical Care Facilities on their own behalf and on behalf of all similarly situated Michigan County Medical Care Facilities (facilities).[1] Plaintiffs filed this complaint to challenge the actions taken by the Michigan Department of Social Services (DSS) to reduce their rate of Medicaid reimbursement, effective April 1, 1991 and May 1, 1991. Plaintiffs also challenge the possible suspension of the Medicaid Program in its entirety in the event that all of the funds appropriated for the Medicaid Program are exhausted prior to the end of the current fiscal year.

Plaintiffs are county-run, long term medical care facilities that provide health care and nursing services to Medicaid beneficiaries, who represent approximately 80% of their patient census. The facilities are all parties to Medicaid provider agreements with the DSS.

In ten substantive counts, the complaint alleges that defendants' plan to implement decisions that cut by a total of 30% the Medicaid reimbursement rate of plaintiffs'

---

1. *See infra* Section V for a discussion of the Class Action issue.

variable cost component violates various federal statutory and regulatory standards. Plaintiffs contend that the budget reductions mandated by the Michigan Legislature and defendants' executive actions taken to enforce those reductions, including a possible elimination of all Medicaid reimbursement to plaintiffs beginning August 1, 1991, are illegal. Plaintiffs seek declaratory, injunctive, and compensatory relief.

In this motion, plaintiffs request a preliminary injunction enjoining defendants from carrying out any of the following: 1) implementing reductions in the variable cost component of the Class III facility Medicaid reimbursement rate by 18.4% effective April 1, 1991 and by a total of 30% effective May 1, 1991; 2) suspending the Medicaid program in August 1991; 3) establishing and permitting the establishment and payment of Medicaid rates based solely on budgetary considerations; 4) failing to take into account proper economic trends and conditions in establishing Medicaid reimbursement rates; and 5) setting, making, and continuing to make payments to Class III long-term care facilities in a manner both inconsistent with the requirements of the Medicaid Act, 42 U.S.C. § 1396, *et seq.*, and its implementing regulations, and violative of the terms of the state's approved Medicaid plan.

### I. Background

■ Title XIX of the Social Security Act establishes a cooperative federal-state program to cover the costs of "providing medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396. This program is known as Medicaid. Participation in Medicaid is voluntary, but if states choose to participate, they must comply with certain requirements of the Medicaid Act (Act) and regulations promulgated by the Secretary of Health and Human Services (Secretary). *Wilder v. Virginia Hosp. Ass'n,* —— U.S. ——, ——, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455, 462 (1990). In order to become eligible for federal assistance under the Act, states must submit to the Secretary for approval a plan for medical assistance (state plan). 42 U.S.C. § 1396. The federal government provides grants to those states with an approved state plan that is being administered by the political subdivisions of the state. *Id.* §§ 1396 & 1396a(a)(1). Administration of the state plan is "mandatory." *Id.* § 1396a(a)(1). "The state plan is required to establish, among other things, a scheme for reimbursing health care providers for the medical services provided to needy individuals." *Wilder,* —— U.S. at ——, 110 S.Ct. at 2513, 110 L.Ed.2d at 462.

Under Michigan's state plan, the amount of federal funding is dependent upon the amount of state funding provided. The current program calls for 45% state and 55% federal funds to reimburse plaintiffs' variable cost component, which is at issue in this case.

### II. Facts

The Michigan Constitution mandates a balanced budget. Mich. Const., art. 5, §§ 18 & 20.[2] Due to a projected $1.5 billion deficit in the 1991 fiscal year state budget, the Michigan Legislature passed a law, 1990 P.A. 357, requiring an across the board 9.2% reduction for each general fund appropriation line item in most state departments, including the DSS. In response to this legislative mandate, the DSS and director Miller have issued, over the past several months, a series of Medical Assistance Program (MAP) Bulletins calling for reductions in the variable cost component of each plaintiffs' Medicaid per diem reimbursement rate for each Medicaid patient. Defendant Miller testified in his deposition

---

**2.** Section 18 provides in relevant part: "Proposed expenditures from any fund shall not exceed the estimated revenue thereof." Mich. Const. art. 5, § 18. Section 20 provides in relevant part: "The governor, with the approval of the appropriating committees of the house and the senate, shall reduce expenditures authorized by appropriations whenever it appears that actual revenues for a fiscal period will fall below the revenue estimates on which appropriations for that period were based." *Id.* § 20.

that "but for Act 357, the Engler Administration would not be cutting the [county facilities'] Medicaid rates for fiscal year 1991." Miller Deposition at 25. Because the fiscal year was already in progress when P.A. 357 was enacted, the reductions for the remaining months had to be greater than 9.2%.

As of April 1, 1991, defendants reduced the variable cost component rate of reimbursement by 18.4%. Effective May 1, 1991, the rate will be reduced an additional 11.6%, for a total 30% cut in the rate of reimbursement for plaintiffs' variable costs (per patient/per day), but not to go below $58.59. Further, on March 1, 1991, the MAP Bulletin stated:

> To fully comply with § 601(1), the Medicaid and General Assistance medical programs will be suspended in their entirety on such date as all appropriated funds for FY [fiscal year] 1990–1991 are incurred. This suspension period will extend to the end of the fiscal year on September 30, 1991. It is anticipated, based on current projections, that the date funds will be incurred will be in August 1991.
>
> Providers will be notified of the final date that services will be reimbursable by the Medicaid program. A future bulletin will be released 30 days prior to the effective date of suspension of the program.·

Plaintiffs are classified under the Michigan state plan as Class III long-term medical care facilities. They are all parties to Medicaid provider agreements with DSS and currently provide health care services to Medicaid beneficiaries, who represent an average of approximately 80% of their patient census. Plaintiffs each receive Medicaid reimbursements through DSS for each Medicaid patient at a per diem rate. Pursuant to Medicaid regulations, plaintiffs are required to agree to accept the Medicaid payment as full compensation for the covered services furnished to Medicaid patients. The Medicaid payment received by each plaintiff is comprised of three components: 1) the plant cost component; 2) the variable cost component; and 3) the incentive component. The variable cost component constitutes the bulk of the Medicaid payment; defendants admit it represents about 93% of plaintiffs' total reimbursement. Rojeski affidavit ¶ 6.

There are five different classes of long-term care facilities under the Michigan state plan. Class I long-term care facilities are proprietary and non-profit facilities. The variable cost computation of the Class I facilities is determined differently from the variable cost computation of the Class III facilities. In addition, prior to April 1, the Class I and Class III facilities had different variable cost reimbursement rate maximums. The maximum variable cost, per diem reimbursement rate for Class I facilities was, and still is, $58.59 per Medicaid patient. The maximum variable cost limit, per diem reimbursement rate for Class III facilities was set by calculating the 80th percentile of the classwide per diem variable cost, updated to the prospective year by application of an appropriate inflationary adjustor for the class. But if a Class III facility had a per diem variable cost above $58.59 per Medicaid patient, the county facility had to wholly or partially reimburse the state for its 45% share of the amount above $58.59.[3] If the 30% reduction is implemented May 1, the maximum variable cost reimbursement rate for the Class III facilities will be reduced 30%, but not to go below that of the maximum Class I facility reimbursement rate—$58.59. With the 30% reduction in the amount allowed for reimbursement, none of the plaintiff facilities will be reimbursed for any of their variable costs above $58.59 per Medicaid patient, per day. Thus, the 30% reductions effectively sets the reimbursement rate limit at $58.59. There are, however, two county medical facilities that have a per diem variable cost below $58.59

---

**3.** Michigan instituted this "maintenance of effort" program in the early 1980s. Mich.Comp. Laws Ann. 400.109(1)(c). The law provides in relevant part: "A county shall reimburse a county maintenance of effort rate determined on an annual basis for each patient day of Medicaid nursing home services provided to eligible persons in long term care facilities owned by the county and licensed to provide nursing home services." *Id.*

per Medicaid patient. The 30% reduction will result in the maximum reimbursement limit for the per diem variable costs of the Class III facilities being lowered from the 80th to the 3rd percentile of the updated classwide per diem variable cost rate.

This effectively means that with implementation of the 30% cuts, all but two of the facilities will lose both the federal government's 55% share of their variable costs between $58.59 and the prior 80th percentile maximum, and the portion of the state's 45% share that was not reimbursed by the counties—assuming the counties give directly to the facilities what they had been giving to the state.

## III. Standard

■■■ The purpose of a preliminary injunction is to preserve the status quo pending final determination of the lawsuit. *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). It is an extraordinary remedy not to be invoked unless the movant clearly meets the burden of persuasion as to the factors to be considered. *Zardui–Quintana v. Richard,* 768 F.2d 1213, 1216, *reh'g denied en banc,* 778 F.2d 793 (11th Cir. 1985); *State of Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir.1975); *Roghan v. Block,* 590 F.Supp. 150, 152–53 (W.D.Mich.1984) *aff'd,* 790 F.2d 540 (6th Cir.1986). The Sixth Circuit has reinforced the warning that courts should exercise great caution and careful deliberation in reviewing a motion for a preliminary injunction because " 'there is no power ... more dangerous in a doubtful case than the issuing of an injunction.' " *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union,* 471 F.2d 872, 876 (6th Cir.1972) (quoting 3 Barron & Holtzoff, *Federal Practice and Procedure* (Wright Ed.) § 1431), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2149, 36 L.Ed.2d 687 (1973).

■■■ Whether to issue a preliminary injunction is within the discretion of the district court and is reviewed for abuse of that discretion. *Forry, Inc. v. Neundorfer, Inc.,* 837 F.2d 259, 262 (6th Cir.1988). The district court's findings of fact are upheld unless clearly erroneous. *Id.* In determining whether to issue a preliminary injunction, the district court must address four factors: 1) the likelihood of success on the merits; 2) irreparable injury that could result without the relief requested; 3) the possibility of substantial harm to others if the injunction is issued; and 4) whether the public interest would be served by issuing a preliminary injunction. *Id.; Christian Schmidt Brewing Co. v. G. Heilman Brewing Co.,* 753 F.2d 1354, 1356 (6th Cir.), *cert. denied,* 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985). The Sixth Circuit cautions that these factors should not be viewed as prerequisites to relief, but rather as factors to be balanced. *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985).

## IV. Discussion

### A. Likelihood of Success on the Merits

Plaintiffs seek an injunction enjoining defendants from implementing both the April 1 and May 1 reductions and enjoining defendants from taking the steps necessary to carry out the announced suspension of the Medicaid Program in August 1991. Because defendants' obligations may be different as to the reductions and the suspension, the Court addresses them individually.

### 1. Reductions

■■■ Plaintiffs argue that the reductions are unlawful because they are arbitrary and below what an efficiently and economically operating Class III facility spends, they are based on purely budgetary concerns without taking into consideration recent economic trends and conditions in health care operating costs, and they unlawfully impair Medicaid beneficiaries' quality of care and access to long term health care facilities.

Defendants' rebuttal is three-fold: 1) there is no legal requirement to distinguish between the Class I and Class III facilities; 2) there is no reasonable basis to distinguish between the Class I and Class III facilities except that historically, the Class III facilities have been operated uneconomically and inefficiently, and the pre–April

rate of reimbursement perpetuated their inefficiency and lack of economy; and 3) because there is no basis for distinction, the Secretary's prior approval of the reimbursement rate for the Class I facilities should extend to the Class III facilities.

The Boren Amendment to the Medicaid Act sets out requirements for the reimbursement of health care providers:

> a State plan for medical assistance *must....*
>
> provide ... for payment ... of ... nursing facility services ... provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State which, in the case of nursing facilities, take into account the costs (including the costs of services required to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident eligible for benefits ...) of complying with subsections [of § 1396r relating to requirements of nursing facilities] ... and provide ... for an appropriate reduction to take into account the lower costs (if any) of the facility for nursing care) [because of a waiver of the requirement to provide for licensed nurses on a 24 hour basis] which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards....

42 U.S.C. § 1396a(a)(13)(A) (emphasis added). The Supreme Court recently held that the Boren Amendment is enforceable in an action by health care providers pursuant to 42 U.S.C. § 1983. *Wilder v. Virginia Hosp. Ass'n*, —— U.S. ——, —— – ——, 110 S.Ct. 2510, 2518–19, 110 L.Ed.2d 455, 468–69 (1990). Section 1983 creates a right of action for individuals who, under color of any state law, are deprived of a right secured "by the Constitution and laws" of the United States. *Nebraska Health Care Ass'n v. Dunning*, 778 F.2d 1291, 1293 (8th Cir.1985), *cert. denied*, 479 U.S. 1063, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987). In the

Supreme Court's own language, "[T]he Boren Amendment imposes a binding obligation on States participating in the Medicaid program to adopt reasonable and adequate rates and this obligation is enforceable under § 1983 by health care providers." *Wilder*, —— U.S. at —— – ——, 110 S.Ct. at 2518–19, 110 L.Ed.2d at 468–69. The Court concluded that the state has the obligation to adopt rates that are reasonable and adequate to meet the costs of an efficient and economical health care provider, and the state's determination is subject to judicial review. *Id.* at —— – —— & ——, 110 S.Ct. at 2519–24 & 2525, 470–474 & 476.

Courts hold that when the state submits its state plan or an amendment to the Secretary for approval, the state must submit objective evidence to support its assurances that the plan provides for rates that are reasonable and adequate to meet the costs of an efficient and economical health care provider. *Amisub (PSL), Inc. v. Colo. Dept. of Social Servs.*, 879 F.2d 789, 795 (10th Cir.1989); *Nebraska Health Care Ass'n*, 778 F.2d at 1294 (citing 42 C.F.R. § 447.250–.272 (1982)); *California Hosp. Ass'n v. Schweiker*, 559 F.Supp. 110, 117 (C.D.Cal.1982), *aff'd*, 705 F.2d 466 (9th Cir. 1983). "Whenever the State Medicaid Agency makes a change in its payment methods and standards, it must make 'findings' and submit 'assurances' to HCFA for approval." *Amisub (PSL)*, 879 F.2d at 795 (citing 42 C.F.R. § 447.253(a), (b), and (c)).

Defendants in this case admit that they have not submitted their reduced reimbursement rates to the Secretary for approval, even though the effective date for one of the reductions has passed. In fact, Defendant Miller admits that he knows of no studies or analyses that have been conducted to determine the causes for the higher costs that Class III facilities incur, such as their alleged higher patient acuity level, their higher labor costs under the Public Employee Relations Act, and their statutory mandate to accept and give preference to Medicaid patients. Defendants also admit that they had not begun the amendment process at all until institution

of this lawsuit. Defendants rationalize that they are not legally required to submit their new payment plan to the Secretary for approval prior to implementation. They state they have until June to do so. Even if application for amendment approval is not required prior to implementing a new rate of reimbursement, it is my opinion that the objective findings necessary to support the assurances, which must be submitted to the Secretary at some point, have to be completed prior to implementation. If such were not required, health care providers and Medicaid beneficiaries would be subject to unreasonable reductions and inadequate reimbursement rates at any time the state determined that cost-saving measures were necessary. Such liberty would severely undermine the assurances mandated by federal law.

Defendants in this case have submitted to the Court no objective findings supporting their reductions. They simply argue the following: the fact that the Michigan Legislature recognizes that plaintiffs have always had "a somewhat higher cost of operation than comparable private for-profit [sic] facilities," and thus enacted the law requiring some reimbursement by counties for the variable costs above that allowed for Class I facilities, "reflect[s] the Legislature's recognition that [plaintiffs] were not being operated as economically as comparable Class I facilities and that the State should not be expected to fully subsidize the additional costs." Defendants' Brief in Opposition at 10–11. Defendants cite no legislative history or economic data to support this view.

■ Defendants rely on the holding in *Colorado Health Care Ass'n v. Colorado Dept. of Social Services*, 842 F.2d 1158 (10th Cir.1988), that states may consider budgetary constraints in amending Medicaid payment methods. However, defendants ignored the Tenth Circuit's later admonition that budgetary considerations are but one factor and cannot excuse noncompliance with federal Medicaid law. *Amisub*, 879 F.2d at 800. Defendants correctly point out that there is no express federal statutory requirement that Class III nursing facilities be treated differently from Class I nursing facilities, in contrast to the statutory requirement that the state plan take into consideration such differences in regard to hospital reimbursement. 42 U.S.C. § 1396a(a)(13)(A). However, merely because there is no *explicit* requirement that the state treat various types of nursing home facilities differently does not mean that such differential treatment might not be necessary—to ensure that reimbursement is "adequate to meet the costs which must be incurred by efficiently and economically operated facilities" in order to provide health care in accordance with the standards set by federal and state laws. When a state chooses to require some nursing home facilities to accept and give preference to every indigent person in need of care, but not to impose such requirements on other nursing facilities, different rates of reimbursement might well be required under the Boren Amendment.

There is no dispute that the Class III plaintiffs have on the average higher variable costs than proprietary and non-profit Class I facilities. Defendants present no evidence that they have studied or analyzed any of the differences between the Class I and Class III facilities that could account for these higher costs. Plaintiffs argue that their higher costs are attributable to, among other things, two primary factors. First, county medical care facility employees are covered by Michigan's Public Employment Relations Act (PERA) rather than the National Labor Relations Act, which governs unionization in the Class I facilities. Virtually all of the Class III facilities' employees that are organized are unionized under PERA, which, plaintiffs state, has long been recognized as subjecting the employer to higher costs than similarly situated, unionized private employers. It is undisputed that most of the Class III facilities' employees are unionized whereas only a minority of the Class I facilities' employees are unionized. Second, plaintiffs are required by state law to accept Medicaid patients, which results in the undisputed fact that about 80% of plaintiffs' patient population are Medicaid beneficiaries. When a Medicaid patient presents

for admission, plaintiffs must accept that patient if there is space, regardless of the patient's acuity level. *See* Mich.Comp. Laws Ann. §§ 331.160 & 400.58b. If space is taken by "persons who are not senile and who are paying the total cost of their care," the plaintiff facility cannot refuse "poor persons" admittance. *Id.* § 400.58b. Class I private facilities, on the other hand, can pick and choose their patients and can offset high care/high cost patients with low care/low cost patients. Defendants have to address these and other economic considerations in determining the appropriate reimbursement rate for the Class III plaintiff facilities.

I find, by the evidence before me at this time, that plaintiffs have met their burden of demonstrating success in their claim that defendants' proposed reductions constitute a violation of the Boren Amendment. Defendants have submitted no objective data to support their assertions that the new rates are reasonable and adequate. Nor have defendants submitted even an iota of evidence that they have conducted any objective economic analysis to support their argument that plaintiffs are currently operating inefficiently and uneconomically, or to determine the effect of the reductions on the quality of care plaintiffs will be able to provide. Accordingly, defendants have not demonstrated that they will provide to the Secretary the necessary factual data to support their assurances when they request an amendment of their state plan.

### 2. Suspension

■ Although plaintiffs seek a preliminary injunction to enjoin defendants from implementing their announced intention to suspend or terminate the medical assistance program when all the appropriated funds are incurred, plaintiffs do not provide legal support to show that they are likely to succeed on the merits of their claim that this proposed action by defendants is unlawful. Plaintiffs concede that participation in the Medicaid program is voluntary, but provide no law governing a state's withdrawal from participation. In fact, plaintiffs do not discuss the legal merits of this claim at all.

Defendants argue that because participation in Medicaid is voluntary, they "*could* withdraw from the program altogether." However, they, too, provide no statutory or case law as to the lawful method for withdrawal. Defendants simply allege that they must give 30 days notice to participating facilities prior to withdrawal and set forth no other prerequisites, if any, that are required. Plaintiffs do not dispute this 30 day notice requirement.

Defendants also argue that because they have "taken no steps to terminate or suspend participation in the Medicaid Program," plaintiff's request for a preliminary injunction at this time is "premature and purely speculative." Defendants' Brief in Opposition at 8. Defendants state, "Such an extraordinary action would be taken only as a last resort, if and when all other options had been exhausted. Moreover, in the event that such a suspension were to become necessary, its lawfulness is likely to turn, at least in part, upon actions yet to be taken by both the legislative and executive branches of government." *Id* at 2–3. Plaintiffs contest this view because defendant Miller said in his statement sent to the facilities that defendants "will" terminate or suspend both programs "on such date" as all the appropriated funds for 1090–1991 are incurred. Certainly the language of that statement alone does not leave much doubt that the funds will run out.

Whether plaintiffs have *standing* to bring this claim, however, is an issue I do not have to address for the purposes of this motion. I find that plaintiffs have not sustained their burden of showing that they are likely to succeed on the merits of their claim that defendants' announced intention to withdraw from the Medicaid Program is unlawful.

### B. Irreparable Injury

■ Immediacy of the injury is an essential factor to address in deciding whether to grant a motion for a preliminary injunction. Although possibly sufficient to establish standing to assert a cause of ac-

tion alleging a Constitutional violation, merely alleging risk of injury is not sufficient to entitle plaintiff to a preliminary injunction. "[A] plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co., Inc. v. Baldrige,* 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original) (citation omitted).

### 1. Reductions

Plaintiffs request the Court to enjoin the implementation of both the 18.4% cut effective April 1, 1991 and the 11.6% cut effective May 1, 1991. Plaintiffs claim that the first checks to reflect the cuts effective April 1, 1991 will not be sent until May 1, 1991. It is plaintiffs' view that the cuts for the month of April have not yet been implemented and therefore are a proper subject for a preliminary injunction because the effect of the change has not yet been felt. I agree with plaintiffs' argument. Because the checks reflecting the reduced reduction have not yet been mailed, the status quo of the facilities' economic condition has not yet been concretely altered as a result of the cuts. An injunction to prohibit implementation of the April 1, 1991 cuts would thus maintain the status quo. Even if the cuts had been implemented, the Court could enjoin defendants from continuing to implement them. When the status quo causes continuing irreparable harm to plaintiffs, the status quo is the " 'last uncontested status which preceded the pending controversy.' " *Crowley v. Local No. 82, Furniture & Piano Moving,* 679 F.2d 978, 995 (1st Cir.1982). In assessing irreparable harm, I thus include harm that plaintiffs demonstrate will arise from the cuts effective as of April 1, 1991.

Plaintiffs have submitted numerous affidavits from the administrators of the various facilities. Many administrators state that the losses will force them to make cuts that could take a variety of forms—layoffs, decreasing patient census, turning away high care/high cost patients, and, perhaps, having to close down because of noncompliance with statutory mandates. The administrators project large dollar amount losses

as a result of the reductions (from $46,262.40 to $323,048.53, just for April through July). Plaintiffs have presented evidence that if the 30% reductions were in effect for 12 months, the facilities would lose a total of about $12,000,000—$2,000,000 from the state and $10,000,000 from the federal government. Defendants have conducted no comparable analysis.

Plaintiffs support this evidence of dollar losses with analysis of the effects on the facilities' operations. Plaintiffs allege that the cuts will result in irreparable harm because they will not be able to meet the costs that are incurred in complying with federal and state standards for quality of care and safety. Defendants have mandated cuts in plaintiffs basic cost reimbursement, not in incentive reimbursement. Defendants admit that cutting the incentive reimbursement would not have been sufficient. They had to cut reimbursement for plaintiffs' basic costs. Moreover, the facilities will not be able to afford to accept every high-cost Medicaid patient that seeks admission, as is currently mandated by state law. Plaintiffs also present uncontroverted evidence that the facilities operate with little or no reserve or at an operating loss. With implementation of the total reductions, not including that caused by the threatened suspension, many will have to take immediate steps to close, and about 30 of the total class of 38 will have to close within nine months. Although defendants state that they have some doubt about this forecast, they present no concrete evidence to dispute it.

I find that plaintiffs have demonstrated clear irreparable harm should the cuts in their per diem variable cost reimbursement rate be allowed.

### 2. Suspension

As to plaintiffs' claim alleging the unlawfulness of defendants' announced intention to withdraw from medical assistance programs altogether, I find that their anticipated injury, although indeed severe, is *at this time* not sufficiently imminent. At this time, defendants' announced intent

to withdraw from Medicaid is nothing more than a threat. As defendants state, they have taken no steps to implement this decision and they view it as a last resort.

C. Harm to Third Parties

 Defendants argue that if the Court enjoins the reductions, the effect would be "to compel the State to purchase those services at a higher, premium rate, thereby exhausting the available funds at a greater rate and increasing the possibility that the available funds will in fact be exhausted prior to the end of the fiscal year." Because defendants have not demonstrated the rates are unreasonably high, this argument is without real merit. Plaintiffs show that defendants' April and May reductions will result in significant harm to third parties if the Court does not grant the injunction. Plaintiffs assert significant harm to: 1) their patient population and their families because of diminished quality of care they will be able to provide, 2) members of their staff, a significant number of whom will have to be laid off, or who may quit if wages or benefits are decreased, 3) the counties themselves, which will experience increased unemployment and whose local vendors (such as the laundry or pharmacy) will suffer from a reduction in business, and 4) the local hospitals which may have to bear a greater burden to care for some of these patients, especially if the quality of care in the nursing homes decline. I find, by the evidence presented, that there would be greater harm to third parties if the Court does not enjoin defendants' planned reductions than if the Court were to allow defendants to proceed according to their present scheme.

D. Public Interest

 Finally, I conclude that any benefits to the public welfare that would result from these reductions are far outweighed by the costs to these facilities.

Defendants state the reductions will benefit the public because "a savings of even $2.3 million will provide more than 30,000 days of medicaid patient care in long-term care facilities that receive a total of $75.00 per patient a day." That means that a thousand patients could receive a month's care. Defendants did not, however, state that they *would* save $2.3 million. They never stated how much they would actually save, taking into consideration the reimbursement from the counties that the State had been receiving prior to April. On the contrary, defendants admit that the maintenance of effort program, which mandates that the counties reimburse the states for their share of reimbursement of variable costs above the maximum Class I rate, "enabled [plaintiffs] to receive more compensation than comparable Class I facilities *without substantial additional costs to the State.*" Defendants' Brief in Opposition at 10 (emphasis added).

There is no question that the State of Michigan is in a budget crisis and that the legislature has responded with a law that requires all state citizens to make sacrifices. However, sacrifice is one thing. Creating conditions that are short sighted, not shown to be cost effective, and potentially life threatening is another.

E. Conclusion

With the evidence presented to me for this motion, plaintiffs have demonstrated that implementation of defendants' 18.4% and proposed additional 11.6% reductions in plaintiffs' per diem variable cost component rate of reimbursement under Medicaid is likely to be unlawful under the statutory requirements of the Medicaid Act and its implementing regulations. Accordingly, in weighing all the factors relevant to a preliminary injunction, I find that they weigh in favor of granting an injunction to prohibit implementation of both the 18.4% and 11.6% reductions in Medicaid reimbursement to plaintiffs.

On the issue of defendant's announced plan to suspend or terminate the medical assistance program altogether when the funds appropriated for this fiscal year run out, there is no question that such action by the state, *should* defendants choose to implement it, would be disastrous to the operations of these facilities, their patient beneficiaries, to hospitals that would bear

the burden of a drastic cut in their referral base for patients requiring discharge, and to a significant portion of the state citizenry, whose health care would be jeopardized. However, I find that plaintiffs have failed to sustain their burden for the purposes of this motion for a preliminary injunction. Plaintiffs have failed to show a likelihood of success on the merits and have not demonstrated that the anticipated injury is more than a risk at this time. Moreover, should the state choose to resort to a suspension or termination of the medical assistance program, they may legislate and execute such a decision in an entirely lawful manner. Accordingly, I deny as premature plaintiffs' motion for a preliminary injunction as to defendants' announcement of intent to suspend the medical assistance program in Michigan.

## V. Class Action

 There remains the issue of plaintiffs being able to maintain a class action. The parties did not brief this issue and the Court cannot make a determination whether to certify the class action at this point in the litigation. Federal Rules of Civil Procedure 23(c) provides that "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits." Fed.R.Civ.P. 23(c)(1). Prior to the Court's determination whether plaintiffs can maintain a class action, the Court should treat the action as a class suit. J. Moore & J. Kennedy, *Moore's Federal Practice* § 23.50, at 23–396 & –397 (2d ed. 1990). It is generally accepted that this rule extends to dismissals and compromise negotiations. *Id.* (citing *City of Inglewood v. City of Los Angeles* 451 F.2d 948 (9th Cir.1971)). I find that given the exigent circumstances in this case, it should also extend to this motion for a preliminary injunction. Moreover, plaintiffs state that the seven or eight remaining facilities have not joined as party plaintiffs because of the bureaucratic delay in seeking proper authority from the counties. They expect

authorization within the next few weeks. For these reasons, this action should be viewed as a class action for the purposes of this preliminary injunction, but subject to my determination under Rule 23(c)(1) after the briefs are filed.